**In the Matter of J.M. DOB: 02/04/84**

**A Minor Under the Age of Eighteen (18) Years.**

**Nos. S–943, S–945.**

Supreme Court of Alaska.

April 25, 1986.

Rehearing Granted in Part and Opinion Amended June 6, 1986.

---

Chris Bataille, Law Offices of Charles E. Cole, Fairbanks, for appellant.

D. Rebecca Snow, Asst. Atty. Gen., Fairbanks, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Blair McCune, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, Guardian Ad Litem.

Michael J. Walleri, Tanana Chiefs Conference, Inc., Fairbanks, for intervenor Village of Kaltag.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

We are asked to decide whether a state superior court's termination of parental rights to an Indian child complied with the commands of the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 (1982). The child's mother asserts that the requisite burden of proof was not met to justify the termination of her parental rights. The child's Indian tribe, the Native Village of Kaltag, contends that the tribal court had exclusive jurisdiction over the matter and that the state court proceedings should have been dismissed for lack of jurisdiction. Because we conclude that the superior court erred in finding the village had waived its jurisdiction, we vacate the termination of parental rights.

### I.

J.M., the child whose future is at issue in this case, was born on February 4, 1984, to A.M., an Athabascan Indian from the village of Kaltag. J.M.'s father is unknown. In late March, J.M. became seriously ill and village health aides recommended medical evacuation. A.M. flew to Fairbanks and hospitalized her infant son. When doctors authorized J.M.'s discharge nearly two weeks later, A.M. failed to pick up her child.

The Kaltag Village Council learned of the situation and issued a written order, dated April 17, assuming custody of J.M. At the Council's direction, J.M. was released from the hospital and placed in a foster home in Galena.

A few weeks later Kaltag Village Chief Franklin Madros contacted Charles Knittel, a state Division of Family and Youth Services social worker in Galena, to request state foster care payments for J.M. Knittel informed the chief that state policy requires a child to be in state custody before foster care payments will be provided. Knittel explained that he would have to file a state petition for temporary custody. Chief Madros told Knittel to do what was necessary to establish J.M.'s eligibility for assistance.

On May 23 the Department of Health and Social Services (hereafter State) filed a petition in state court for temporary custody of J.M.; the petition was granted the next day. On August 7 the State filed a petition for an adjudication of J.M. as a child in need of aid, pursuant to AS 47.10.-010(a)(2)(A).

In late September the Native Village of Kaltag (hereafter Kaltag) moved to intervene as a matter of right under 25 U.S.C. § 1911(c).[1] That section of the Indian Child Welfare Act (ICWA) authorizes an Indian child's tribe to intervene in state court proceedings regarding foster care placement of the child or termination of

1. 25 U.S.C. § 1911(c) provides:
   In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodi-
   an of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

parental rights. Intervention was granted, and Kaltag participated in the adjudication hearing on October 8.

During the hearing, counsel for Kaltag noted the possibility of a jurisdictional question under the ICWA, and reserved the right to litigate it later. Kaltag entered into the record a copy of the Village Council's April order assuming custody of J.M. The State introduced a letter dated October 7 from Chief Madros to the court stating that J.M. "should remain in the custody of the State." The letter apparently was written by Knittel, signed by the chief, and delivered to the court by Knittel. It was admitted into evidence without objection.

The next day the court entered an order adjudicating J.M. a child in need of aid and placing him in the custody of the State. The court scheduled a November 19 hearing to determine whether parental rights should be terminated.

On November 8 Kaltag filed a motion to dismiss the proceedings involving J.M. for lack of state court jurisdiction. Kaltag claimed exclusive jurisdiction under section 1911(a) of the ICWA, and asserted that the village had not relinquished its jurisdiction to the State. Section 1911(a) provides that "[w]here an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child." 25 U.S.C. § 1911(a).

The trial court denied the motion to dismiss. The court found that Kaltag, through the actions of Chief Madros, had "relinquished custody [of J.M.] to the State of Alaska and ... [was] estopped from claiming otherwise."

On November 19 the trial court conducted a hearing to determine whether A.M.'s parental rights to J.M. should be terminated. After hearing testimony from social workers and several members of A.M.'s tribe, the court issued findings of fact and an order terminating A.M.'s parental rights. The order included a finding that the court had jurisdiction over the parties and subject matter "because the Village of Kaltag released whatever jurisdiction it

might have claimed in order to obtain state funded foster care for [J.M.]."

These appeals by Kaltag and the mother followed. Kaltag contends the state court should have dismissed the proceedings for lack of jurisdiction and allowed the tribal court to determine J.M.'s fate. The mother asserts that the termination of her parental rights was erroneous because it was not supported by the burden of proof required under the ICWA.

II. Should the superior court have dismissed the proceedings for lack of jurisdiction?

a) The statutory framework

It is agreed that the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963, applies to the proceedings involving J.M., who is an Indian child as defined in the act. *See* 25 U.S.C. § 1903(4). When Congress enacted the ICWA in 1978 it declared a two-fold purpose: to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families. *Id.* § 1902. To further this national policy, Congress enacted the jurisdictional provisions in section 1911(a):

An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. *Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.*

25 U.S.C. § 1911(a) (emphasis added).

Kaltag argued before the trial court that when the Village Council issued its order assuming custody of J.M., he became a "ward of a tribal court" over whom the tribe had exclusive jurisdiction under section 1911(a). Kaltag further asserted that it never relinquished its jurisdiction, and that the trial court therefore was required to dismiss the state court proceedings.

The State did not dispute that J.M. was a ward of a tribal court or that Kaltag had exclusive jurisdiction under section 1911(a), but argued that Kaltag had waived its jurisdiction by releasing custody of J.M. to the State. Thus, the question before us is a narrow one: did the trial court err in finding that the tribe had waived its exclusive jurisdiction?

■ Although we are not asked to decide whether Kaltag is an "Indian tribe" or whether the Village Council is a "tribal court" within the meaning of the ICWA, we will describe the legal bases on which Kaltag relies to justify these conclusions. Kaltag's position is that the ICWA defines "Indian tribe" to mean "any Indian tribe, band, nation, or other organized group or community of Indians ... including any Alaska Native village as defined in section 1602(c) of Title 43." 25 U.S.C. § 1903(8). Section 1602(c), which is part of the Alaska Native Claims Settlement Act, recognizes a long list of Alaska villages, including Kaltag, to be "Native villages" if they had a population of at least 25 Natives at the time of the 1970 census. *See* 43 U.S.C. §§ 1602(c), 1610(b)(1) (1982). Thus, Kaltag concludes it is an "Indian tribe" within the meaning of the ICWA.

The ICWA defines "tribal court" broadly as:

> a court with jurisdiction over child custody proceedings and which is either a Court of Indian Offenses, a court established and operated under the code or custom of an Indian tribe, or any other administrative body of a tribe which is vested with authority over child custody proceedings.

25 U.S.C. § 1903(12).

Kaltag submits that its Village Council is authorized to serve as its tribal court over child custody proceedings. The village constitution empowers the Council to "act as

judges of minor offences [sic] or small differences among village residents." Kaltag Const. and Laws § 2, part 9. The constitution prohibits the Council from acting upon "serious matters." *Id.* § 2, part 10. Kaltag construes "minor offenses" and "small differences" to include misdemeanors, village ordinance violations, domestic relations and small claims, while "serious matters" are felony criminal offenses.[2]

Kaltag states that its Village Council is the sole governing body of the tribe, and performs legislative, executive and judicial functions. While this integration of functions is uncommon in many political structures, numerous courts have recognized the unique form of tribal governments and tribal dispute resolution. In *Howlett v. Salish and Kootenai Tribes of Flathead Reservation*, 529 F.2d 233 (9th Cir.1976), the plaintiffs challenged the authority of the tribal council to judge whether aspiring candidates were qualified for council membership. The Ninth Circuit agreed with the district court's analysis:

> To lawyers, used to thinking of courts as the interpretative arm of government, it does seem strange that a single legislative and executive arm of government should be permitted to interpret the law, but we deal here not with state law ... but with Indian law enacted by Indians. The Indians, except as inhibited by the Indian Civil Rights Act, are free to structure their government as they see fit. Nothing precludes the Indians from vesting, as they did, the power of interpretation in a tribal council rather than in a tribal court.

*Id.* at 240.

Similarly, the broad definition of "tribal court" included in the ICWA reflects Congressional awareness that tribal justice systems may differ from Anglo-American

---

**2.** This interpretation of Kaltag's constitution, which was drafted prior to Alaska statehood, appears consistent with the historical distinction between tribal and federal law and order functions. *See* Cohen, Handbook of Federal Indian Law 332–48 (1982 ed.). Many judicial decisions have recognized the broad scope of tribal authority in the area of domestic relations among tribal members. *See, e.g., Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *see also* H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 35, *reprinted in* 1978 U.S.Code Cong. & Ad.News 7530, 7558.

systems. Kaltag suggests that, by defining a tribal court to include "any other administrative body of a tribe which is vested with authority over child custody proceedings," 25 U.S.C. § 1903(12), the ICWA recognizes that a village council such as Kaltag's may operate as a "tribal court."

b) Did Kaltag waive its jurisdiction?

In deciding whether the trial court was correct in finding a waiver of jurisdiction, the state suggests that the "clearly erroneous" standard of review is applicable. We conclude that a broader scope of review is appropriate. Since the trial court finding was based on non-testimonial, documentary evidence, we are in as good a position as the trial court to exercise independent judgment to determine the facts. *See Fairbanks Publishing Co. v. Pitka*, 445 P.2d 685, 688 (Alaska 1968); *see also State v. Phillips*, 470 P.2d 266, 268 (Alaska 1970).

The trial court, in its order denying Kaltag's motion to dismiss, found that "the Village Council, through Mr. Madros, has relinquished custody to the State...." When the court subsequently ordered parental rights terminated, the court reiterated its finding that "the Village of Kaltag released whatever jurisdiction it might have claimed in order to obtain state funded foster care for [J.M.]." The State contends that the evidence the trial court had before it fully supported the finding that jurisdiction had been waived. We disagree.

The evidence included: 1) the Council's April order assuming tribal custody of J.M.; 2) the State's petition for temporary custody and its petition for adjudication of a child in need of aid; both petitions included statements that the State's assistance had been solicited by the Kaltag council chief; 3) the October 7 letter to the court from Chief Madros; and 4) a document filed by Kaltag, pursuant to 25 U.S.C. § 1915(b), specifying a home in Galena as "the appropriate foster home for J.M. during the term of State custody."

On the basis of this evidence, we cannot find that the village knowingly waived its jurisdiction. None of the tribal documents—the custody order, the chief's letter, or the document specifying a foster home—referred to "jurisdiction" or mentioned a transfer of jurisdiction. Furthermore, none of the evidence before the trial court indicated a clear intent by the Village Council to waive its authority to determine J.M.'s ultimate placement.

The trial court apparently relied heavily on the letter written by Chief Madros. It stated that, "[a]s Chief of the Kaltag Traditional Council," he had discussed J.M.'s case with state social worker Knittel, and that Knittel also had talked with members of A.M.'s family. The letter stated that the people contacted by Knittel "are in agreement that [J.M.] should remain in the custody of the State, and that his mother's rights to him should be terminated." The letter further stated: "I ... recommend that the State Court should approve the termination of [A.M.'s] parental rights...."

Kaltag argues that the village constitution does not empower the chief to act on behalf of the Council; therefore, any unilateral action by the chief would be void as an ultra vires act. Kaltag notes that its constitution vests authority, including judicial authority, to act for the village in a five-member council and provides for one member to be elected president. *See* Kaltag Const. and Laws § 1, parts 3 and 8; § 2, parts 2, 7, 8 and 9. The constitution authorizes the president, who also is referred to as the council chief, to chair council meetings and to "represent the village interests in dealing with outsiders." *Id.* § 2, part 4. However, it does not authorize the president to act unilaterally on behalf of the council. Consequently, Kaltag argues that even if the chief's letter is viewed as intending to waive tribal jurisdiction, such a waiver could occur only through an official action of the Village Council. We agree.[3]

Furthermore, in our view Chief Madros' letter does not even purport to waive tribal

**3.** We reject the State's claim that Kaltag's argument regarding the limited nature of the chief's power was not raised below and therefore should not be considered on appeal. The vil-

jurisdiction over J.M. At most, the letter states a recommendation by the chief regarding termination of parental rights, and implies an understanding by the chief that the State had taken custody of J.M. in order to provide foster care payments. The fact remains that the only official Village Council document before the court was an order assuming tribal custody of J.M. There is no evidence that the Council ever modified or rescinded its order, nor is there any other evidence of an express waiver of jurisdiction.

To *imply* a waiver of jurisdiction would be inconsistent with the ICWA objective of encouraging tribal control over custody decisions affecting Indian children. In enacting the ICWA, Congress "expressed its clear preference for ... deferring to tribal judgment on matters concerning the custody of tribal children...." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,585 (1979). The guidelines published by the Department of Interior to aid courts in interpreting the ICWA further provide that state court proceedings involving custody of Indian children "shall follow strict procedures and meet stringent requirements" to justify any result contrary to the preferences expressed in the ICWA. *Id.* at 67,586.

We note that courts historically have been reluctant to imply a waiver of Indian rights. When the ICWA's exclusive jurisdiction provisions were enacted, Congress

sought to confirm the holding in a line of state and federal cases that a tribe has exclusive jurisdiction over an Indian child who resides or is domiciled on a reservation, and Congress defined "reservation" very broadly.[4] *See* H.R.Rep. No. 1386, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Ad.News 7544. In two cases noted in the House Report the courts strained to avoid implying a waiver of tribal jurisdiction. *See Wisconsin Potowatomies v. Houston*, 393 F.Supp. 719 (W.D. Mich.1973); *Wakefield v. Little Light*, 276 Md. 333, 347 A.2d 228 (1975).

In the *Potowatomies* case, the court ruled that a tribe had not waived its exclusive jurisdiction by permitting a tribal member to seek custody of three Indian children in state court. 393 F.Supp. at 734. The court concluded:

> The tribe itself must have, by some prior act performed through a legally recognized procedure, conferred jurisdiction upon the [state] court.
>
> ....
>
> ... It is sufficient that the tribe has shown that, according to its standards, it did not abandon interest in the children or jurisdiction over them. Relinquishment of Indian rights is not to be lightly inferred. Doubts as to the intent of a law, or a treaty, are to be resolved in favor of the Indians, and [such laws] are to be construed as the Indians understood their meaning.

lage made the following statement in its memorandum filed in the trial court in support of the village's motion to dismiss: "On its face, the Chief's letter is nothing more than an expression of his individual desire. Only the Council has the power to release custody of the child to the State...." The memorandum further noted that the State "cannot produce a council order transferring the case to the State forum. Under such circumstances, it is certain that the village retains jurisdiction...." We conclude that the argument Kaltag raises here was adequately presented to the trial court.

The State notes that Kaltag failed to provide the trial court with a copy of the village constitution. However, this omission does not preclude our consideration of the document. *See* Alaska R.Evid. 202, 203(b). Furthermore, the ICWA requires that every state "give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable

to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity." 25 U.S.C. § 1911(d).

4. The ICWA defines "reservation" to mean "Indian country as defined in section 1151 of Title 18 and any lands ... title to which is either held by the United States in trust for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation." 25 U.S.C. § 1903(10). Section 1151 of Title 18 defines "Indian country" to include "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ... (b) all dependent Indian communities within the borders of the United States ... and (c) all Indian allotments, the Indian titles to which have not been extinguished...." 18 U.S.C. § 1151 (1982).

*Id.* at 733–34 (citation omitted). While this pre-ICWA case is significant because Congress sought to confirm its holding, the case also states a well-established principle that the waiver of Indian rights should not be easily inferred. *See* Cohen, Handbook of Federal Indian Law 283 (1982 ed.). Case law also holds that procedural requirements must be strictly complied with before a state can exercise jurisdiction over a matter that otherwise would be within a tribe's jurisdiction. *See, e.g., Blackwolf v. District Court*, 158 Mont. 523, 493 P.2d 1293, 1295 (1972).

With these principles in mind, we hold that the trial court erred in finding that Kaltag had waived its jurisdiction over J.M. There certainly was no evidence of an express waiver, and it would be inappropriate to find an implied waiver based on the evidence presented here. Because one of the objectives of the ICWA is to insure that tribes fully understand and have an opportunity to exercise their rights under the act, *see, e.g.,* 25 U.S.C. § 1912(a), we conclude that a tribe's waiver of exclusive jurisdiction must be express, unequivocal and knowingly made. Requiring a written waiver from the tribal entity authorized to make such a decision will help insure that a tribe has notice of the rights it is giving up, and will avoid the confusion that occurred in this case.[5]

Because we conclude that the trial court erred in failing to dismiss the proceedings involving J.M., we do not decide whether the termination of parental rights was proper. That determination will be made in the tribal forum.[6]

[5] The requirement of a written waiver will benefit both the state and the Indian tribe involved. By affording both parties a clear understanding whether the tribe is waiving jurisdiction to determine a child's ultimate placement, the need for litigation should be avoided. Also, the parties will have a solid basis for negotiating an agreement, if they so choose, regarding the care and custody of an individual child and whether the state is to provide foster care payments. *See infra* note 6 for a discussion of 25 U.S.C. § 1919(a), which authorizes such agreements.

[6] One final argument merits mention. Kaltag suggests that even if the tribe did waive its exclusive jurisdiction, the state could not assert

The superior court order terminating the parental rights of A.M. is VACATED, and the case is REMANDED for dismissal of the state court proceedings.

jurisdiction absent a formal agreement under section 1919(a) of the ICWA. Section 1919(a) authorizes tribes and states to enter into mutual agreements "respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis...." 25 U.S.C. § 1919(a). However, we note that the section merely "authorize[s]" such agreements; it does not purport to preclude the state's exercise of jurisdiction where a tribe has clearly expressed an intent to waive jurisdiction. *Cf. Native Village of Stevens v. Smith*, 770 F.2d 1486, 1489 (9th Cir.1985).