**In the Matter of the GUARDIANSHIP OF Q.G.M., a minor.**

**No. 74370.**

Supreme Court of Oklahoma.

March 26, 1991.

---

**12.** *In re D.B.W., supra* note 11 at 1151. See also *Tulsa Tribune v. Oklahoma Tax Com'n,* Okl., 768

P.2d 891, 897 (1989) (Opala, V.C.J., dissenting).

L. Susan Work and Colline W. Meek, Oklahoma Indian Legal Services, Inc., Oklahoma City, for appellant.

Richard E. Butner, Wewoka, for appellees.

KAUGER, Justice.

After refusing to allow the Seminole Tribe to intervene, the trial court granted letters of guardianship to the paternal grandparents of a Seminole Indian child. The dispositive issues are whether: 1) an Indian tribe which seeks to intervene in the proceedings must intervene at the first stage of the proceedings, or whether it may wait to intervene until the trial court reaches the dispositional stage; and 2) if the tribe fails to appeal the denial of its right to intervene, may the mother of the child raise the issue on appeal. We find that even though the proceeding involves an intra-family custody dispute, the Indian Child Welfare Act, 25 U.S.C. § 1912(a) (1978) (ICWA) allows the tribe to intervene at any point of the proceedings; and that the mother may raise this error on appeal.[1]

## FACTS

Q.G.M. is an eight year old Indian child whose custody is subject to the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1923 (1978).[2] His mother, M.M. (appellant-moth-

---

1. The mother also raised the issues of whether: in a private involuntary action, the grandparents who seek custody of their grandchild must make active efforts under 25 U.S.C. § 1912(d) (1978) to prevent the breakup of the Indian family; the trial court's finding was supported by clear and convincing evidence; the trial court should have dismissed the case after the grandparents' attempted to retain Q.G.M. after visitation; the admission of hearsay evidence was prejudicial; the admission of the hypothetical question to the expert witness was error;

and whether the trial court's refusal to allow counsel to be present during Q.G.M.'s testimony in the trial court's chambers was erroneous. Because the cause is remanded for failure to allow the tribe to intervene, we make no determination concerning these allegations.

2. It is in the Indian child's best interest that its relationship to its tribe be protected. *In re Appeal in Pima County Juvenile Action No. S-903*, 130 Ariz. 202, 635 P.2d 187, 189 (App.1981),

er) is a fullblood Seminole. His father died in 1983. For most of Q.G.M.'s life, he and his mother resided with J.A.H., his "Indian grandmother",[3] in Wewoka. The appellees, B. and G.M., Q.G.M.'s paternal grandparents also live in Wewoka. After school on May 16, 1989, B. and G.M. took Q.G.M. to their home for their regular visitation with their grandson. Apparently, M.M., Q.G.M.'s mother, suffered a gallstone attack that day, and she was scheduled to go into the hospital for surgery two days later. That evening, Q.G.M.'s mother called him at his grandparent's home, and told him that she was ill. She also told B.M., the child's paternal grandmother, that she planned to move to Norman. B.M. responded that she and her husband would oppose the move.

On the morning of May 17, 1989, the mother's boyfriend attempted to pick up Q.G.M. at his grandparents, but they refused to let him leave. Later that morning, B. and G.M. called their lawyer, and they told him to file a petition for guardianship and for temporary custody. Around noon that same day, the mother located the grandparents and Q.G.M. at a hospital cafe-

---

cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). The Indian Child Welfare Act, 25 U.S.C.1901(3) (1978) provides that Indian tribes are to play a central role in custody proceedings involving Indian Children. If Indian tribes and nations are to protect the values Congress recognized, they must be allowed to participate in hearings in which those values are significantly implicated. *Village of Chalkyitsik v. M.S.F. & J.J.G.*, 690 P.2d 10, 15 (Alaska 1984). In his dissent, Justice Simms relies on *Application of Bertleson*, 189 Mont. 524, 617 P.2d 121, 125–26 (1980), for the proposition that the ICWA does not apply to intra-family custody disputes. The custody dispute in *Bertleson* arose between the non-Indian mother and the child's Indian grandparents. At the time the dispute arose, the child was living on the Chippewa Cree Reservation with the grandparents. The facts in *Bertleson* are not clear; however, it appears that the grandparents may not have spoken English. Although the Montana court did find in *Bertleson* that the dispute did not fall within the ambit of the ICWA, *it did not hold that the tribal court lacked jurisdiction to hear the child custody matter.* Instead, it remanded the cause for the trial court to determine whether it should assume jurisdiction. Factors to be considered in this determination included the contacts of the child; *the contacts of the parties to the state and to the tribe;* the best interest of the child; the physical presence of the child; the domicile and in personam jurisdiction over the parties; *the existence of tribal law or tribal customs relating to child care and custody; the nature of the child's relationship with her grandparents and with her mother; the child's assimilation into and adjustment to life in the tribe and on the reservation; the mother's ethnic and cultural background and membership in or ties to the Chippewa Cree Tribe; the length of the child's residence both on and off the reservation;* the domicile and residence of the child's father and the child's personal relationship with her father. While holding that the ICWA was not applicable, the Montana court remanded the cause for consideration of some of the same factors the ICWA was enacted to insure—that an Indian child not be removed from the Indian community and consequently lose touch with Indian traditions and heritage. *See, Mississippi Band v. Holyfield,* 490 U.S. 30, 36, 109 S.Ct. 1597, 1602, 104 L.Ed.2d 29, 39 (1989).

The *Bertleson* decision has been sharply criticized on the ground that its interpretation is contrary to the express provisions of the ICWA. *A.B.M. v. M.H. & A.H.,* 651 P.2d 1170, 1173 (Alaska 1982), cert. denied, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *In re Custody of S.B.R.,* 43 Wash.App. 622, 719 P.2d 154, 156 (1986).

For other cases in which *Bertleson* has met with opposition, see *In re Adoption of T.N.F.,* 781 P.2d 973, 977 (Alaska 1989), cert. denied, —— U.S. ——, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990) and *In re Junious M.,* 144 Cal.App.3d 786, 193 Cal. Rptr. 40, 46 (1983).

**3.** The "Indian grandmother" is the child's great-aunt. The word orphan, illegitimate, and adoption do not exist naturally in any Native American language, most likely because of the predominant cultural pattern of the extended family found among North American Indians. Report on Bottle Hollow, Utah Conference on Supportive Care, Custody, Placement and Adoption of American Indian Children, American Academy of Child Psychiatry, p. 19 (1977). The phenomenon of the corporate tribal embrace was first described by the American anthropologist, Lewis Morgan, in 1871. He noted that within the tribes all members of the same generation knew one another as brothers and sisters, while the parental generation were recognized as mothers and fathers, and the grandparental generation as grandmothers and grandfathers. This kind of classification system reflects a feeling of unity within lineages. Morgan found that the care of children was a joint, rather than an individual responsibility. Morgan's research also discovered that these people had a keen interest in their genetic relationship, and an obsession with tribal kinship. C. Darlington, The Evolution of Man and Society, Ch. 3, p. 50–1 (Simon and Schuster 1975).

teria. When the mother motioned for the child to come with her, the grandmother grabbed Q.G.M.'s arm; the grandfather hit the mother; and the boyfriend struck the grandfather. The police were called and they decided that Q.G.M. should leave with his mother. While the altercation at the hospital was in progress, the grandparent's attorney was filing an ex parte petition for temporary custody; and although the ex parte order was issued, it was never enforced. The mother was allowed to keep Q.G.M. until the trial on the guardianship issue. In July, the mother moved to Norman with Q.G.M., her boyfriend and their daughter.

The Seminole Tribe received notice of the proceedings on July 10, 1989. The tribe did not respond to the notice until October 16, 1989, when it delivered a letter to the trial court's secretary during the course of the guardianship proceeding. The tribe's letter advised the court that the Seminole Tribe was not represented by counsel; but that it wanted to be consulted about the placement of the child should the trial court decide to remove Q.G.M. from his mother's custody. The trial court treated the letter as a motion to intervene, and it denied the

motion. On October 20, 1989, the trial court issued letters of guardianship to the grandparents, and the mother appealed.

## AN INDIAN MOTHER MAY ASSERT THE FAILURE OF THE TRIAL COURT TO ALLOW HER TRIBE TO INTERVENE IN THE PLACEMENT OF HER CHILD.

Neither party disputes the fact that the Seminole Tribe received notice of the proceedings on July 10, 1989. The questions we must answer are: 1) whether the tribe can wait to intervene until the dispositional stage of the proceeding; and 2) whether the mother may challenge the failure of the trial court to allow intervention even though the tribe did not appeal.

### A.

■ The stated purpose of the ICWA is to protect the best interests of the Indian child through promoting the stability and security of Indian tribes and Indian families by establishing guidelines to prevent the removal of these children from their Indian culture.[4] Section 1903(1)[5] of the Act defines custody proceedings under the

**4.** Title 25 U.S.C. § 1902 (1978) provides:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."

Title 10 O.S.Supp.1982 § 40.1 provides:
"The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the Federal Indian Child Welfare Act, P.L. 95–608. It shall be the policy of the state to cooperate fully with the Indian tribes in Oklahoma in order to ensure that the intent and provisions of the Federal Indian Child Welfare Act are enforced."

See also, Comment, "The Indian Child Welfare Act of 1978: Protecting Essential Tribal Interests," 60 U.Colo.L.Rev. 131–32 (1989).

**5.** Title 25 U.S.C. § 1903(1) (1978) provides:

"For the purposes of this chapter, except as may be specifically provided otherwise, the term—
(1) 'child custody proceeding' shall mean and include—
(i) 'foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
(ii) 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship;
(iii) 'preadoptive placement' which shall mean the temporary placement of the Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
(iv) 'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.
Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents."

ICWA. The only two proceedings excluded from the ambit of the Act are custody provisions of a divorce decree and delinquency proceedings—neither of which are at issue in the instant cause. Express exceptions in a statute exclude all other exceptions.[6] Recognition of a third exception—that the act will not apply to intrafamily custody disputes—would require judicial legislation rather than statutory interpretation. The statutes protect the family, the child, and the tribe from separation. Intervention by the tribe insures that the child will not be removed from the Indian community and consequently lose touch with Indian traditions and heritage.[7] Section 1915(c)[8] is a clear indication of Congressional intent that tribes be involved in the placement of the child. Because placement of the child in the Indian community is the focal point of the ICWA, the mother has the right to raise this error on appeal.[9]

Pursuant to 25 U.S.C. § 1915(c) the tribe may change the order of preference for the placement of the child which is set forth in § 1915(b) without showing good cause. The tribe need only show that the change is the least restrictive setting. Other than the trial court, the tribe is the only party which can change the order of preference.

## B.

■ However, the grandparents argue that the tribe waived its rights when it neither responded nor requested additional time to prepare for the guardianship proceeding which is permitted by 25 U.S.C. § 1912(a) (1978).[10] Although we might

6. *In re Custody of S.B.R.,* see note 2, supra.

7. See, *Mississippi Band v. Holyfield,* see note 2, supra.

8. Title 25 U.S.C. § 1915(a), (b), (c) (1978) provides:

"(a) In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

(b) Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(c) In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: Provided, That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences."

Title 10 O.S.Supp.1982 § 40.6 provides:

"The placement preferences specified in 25 U.S.C. Section 1915, shall apply to all pre-adjudicatory placements, as well as pre-adoptive, adoptive and foster care placements."

9. Various other provisions of the ICWA set procedural and substantive standards for those child custody proceedings that do take place in state court. The procedural safeguards include requirements concerning notice and appointment of counsel; parental and tribal rights of intervention and petition for invalidation of illegal proceedings; procedures governing voluntary consent to termination of parental rights; and a full faith and credit obligation in respect to tribal court decisions. See 25 U.S.C. §§ 1901–1914 (1978).

10. Title 25 U.S.C. § 1912(a) (1978) provides in pertinent part:

"In any involuntary proceeding in a State court ... No foster care placement ... proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding."

Title 10 O.S.Supp.1982 § 40.4 provides in pertinent part:

"In any involuntary Indian child custody proceeding ... The notice shall be written in clear and understandable language and include the following information: ..."

agree with the grandparent's position, we are precluded from doing so by 25 U.S.C. § 1911(c) which provides:

> "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene *at any point* in the proceeding." (Emphasis added).[11]

 As a matter of statutory analysis, the Court must give effect to the Act. We cannot ignore the plain words of a statute.[12] The statute allows the tribe to intervene at any point in the proceeding, and 25 U.S.C. § 1903(1)(i) (1978)[13] specifically includes guardianship proceedings. Even if a tribe fails to intervene at the beginning of a proceeding, it is not precluded from intervening at a later point in the absence of an express waiver of the right to intervene. A waiver of rights by the tribe should not be inferred.[14] Because of the ICWA objective to ensure that tribes have an opportunity to exercise their rights under the Act, and because of the plain language of § 1911(c), a tribe's waiver of the right to intervene must be express. It cannot be based simply on its failure to intervene at the initial proceeding. To do so, would be inconsistent with the ICWA goal of encouraging tribal control over custody decisions affecting Indian children.[15] The Seminole Tribe did not explicitly waive its right to intervene. Instead, it requested that the trial court allow it to be involved in the placement of the child should the child be removed from his Indian home.

CONCLUSION

The trial court erred when it denied the tribe's motion to intervene at the dispositional stage of the proceeding.[16] Failure to allow the mother to press this issue on appeal would thwart the central purpose of the Indian Child Welfare Act.

REVERSED AND REMANDED.

OPALA, C.J., and DOOLIN, ALMA WILSON and SUMMERS, JJ., concur.

HODGES, V.C.J., concurs in part, dissents in part.

LAVENDER, SIMMS and HARGRAVE, JJ., dissent.

HODGES, Vice Chief Justice, concurring in part, dissenting in part:

I concur in that part of the majority opinion which holds the trial court erred when it denied the tribe's motion to intervene. I must recede, however, from that part of the majority opinion which allows the mother to raise this error on her appeal where the tribe did not invoke its right of appellate review. The tribe has not appealed the trial court's ruling, nor joined in the appeal of the mother.

SIMMS, Justice, dissenting:

I.

I must respectfully dissent. I concur with Justice Hodges insofar as he believes the majority errs in holding that this moth-

---

3. A statement of the rights of the biological parents or Indian custodians, and the Indian tribe: ...

c. to request an additional twenty (20) days from receipt of notice to prepare for the proceeding; further extensions of time may be granted with court approval."

**11.** The Oklahoma Indian Child Welfare Act does not contain a similar provision.

**12.** *Jet–Nash School Dist. No. I–4 v. Cherokee School Dist. No. I–46,* 776 P.2d 553–54 (Okl. 1989); *Toxic Waste Impact Group, Inc. v. Leavitt,* 755 P.2d 626, 630 (Okl.1988).

**13.** Title 25 U.S.C. § 1903(1)(i) (1978), see note 5, supra.

**14.** *In re J.M.,* 718 P.2d 150, 155 (Alaska 1986) (A letter written to a social worker by the Chief of the tribe recommending termination of parental rights did not waive tribal jurisdiction of the matter); *In re Adoption of Begay,* 107 N.M. 810, 765 P.2d 1178, 1180 (Ct.App.1988) (The Court found that because the tribe did not intervene until the case was on appeal did not constitute a waiver of the tribe's right to intervene).

**15.** Title 25 U.S.C. § 1902 (1978), see note 4, supra; Title 10 O.S.Supp.1982 § 40.1, see note 4, supra.

**16.** Id.

er may appeal the Tribe's denial of its motion to intervene. There is no provision in the Indian Child Welfare Act or other authority which supports finding that this mother or any third party had the capacity to raise the rights and interests of the Tribe on appeal. The Tribe did not appeal and any issues regarding the trial court's ruling on its attempted intervention have been abandoned and may not be presented by another.

## II.

To my mind, however, there remains a threshold question as to the applicability of the Act which might deserve the additional consideration of this Court—a question as to the applicability of the Act to intra-family custody disputes in the first place.

As noted by the Supreme Court in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 1600, 104 L.Ed.2d 29 (1989), the Act was the "product of rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that result in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement usually in non-Indian homes." The Court noted that findings of Congress incorporated into the Act reflect the concern:

"(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by non-tribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions ... 25 U.S.C. § 1901."

The express declaration of Congressional policy in the enactment of the Act is:

"... that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adop-

tive homes which will reflect the unique values of Indian culture, and by providing for assistance as Indian tribes in the operation of child and family service programs." 25 U.S.C. § 1902.

We are not faced here however, with a situation involving abusive practices by a public or private agency seeking to remove an Indian child from his family and arbitrarily place him in an non-Indian foster or adoptive home or institution. Neither is this the type of guardianship matter envisioned in 25 U.S.C. § 1903. This is an intra-family custody dispute that arises from the mother's unquestioned serious drug and substance abuse problems. The boy's paternal grandparents were concerned that his welfare would be in jeopardy if he remained with his mother and they sought his custody. These are not strangers to the boy or his Indian environment or persons who are representative of abusive and insensitive welfare practices. They are his own grandparents and they come within the definition of "extended family" in the Act. Their evidence convinced the trial court that the child's best interests would be served by living with them and the majority opinion makes no finding that the court's judgment in that regard was not supported by clear and convincing evidence, although such evidentiary failings are urged on appeal by the mother.

The Supreme Court of Montana addressed the issue of this intra-family limitation of the scope of the Act in *Application of Bertleson*, 617 P.2d 121 (Mont.1980), an internal family custody dispute which involved a non-Indian mother and Indian paternal grandparents. I am persuaded that the Court reached the correct result in holding that the Indian Child Welfare Act did not apply to such a situation. That Court held:

"[This] dispute does not fall within the ambit of the Indian Child Welfare Act. The Act is not directed at disputes between Indian families regarding custody of Indian children; rather, its intent is to preserve Indian culture values under circumstances in which an Indian child is placed in a foster home or other protec-

tive institution. The House Report sets forth the essential thrust of the act:

'... to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal Standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes or institutions which will reflect the unique values of Indian culture ...' H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 21, reprinted in [1978] U.S.Code Cong. & Admin.News, p. 7530.

"The issue here is not which foster or adoptive home or institution will best 'reflect the unique values of Indian culture ...' Rather, the present case involves an internal family dispute between the mother and the paternal grandparents over the custody of the child." Id., at 125.

In the instant case, the majority reverses the trial court's order placing custody of this child with his grandparents in spite of the fact that all the procedural safeguards and requirements of the Act were met except for allowing the Tribe to intervene, and the Tribe does not appeal that denial. Although I do not believe that this situation comes within the intended scope of the Act, it appears that even with the Tribe's participation, the same result would be reached by the trial court. The Act does not give Indian relatives priority over non-Indian relatives with regard to placement of custody of Indian children. As the majority notes, the Act provides that in the placement of Indian children first preference shall be given to a member of the child's extended family. 25 U.S.C. § 1915. An "extended family member" under the Act "shall be defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." 25 U.S.C. § 1903.

I would affirm the trial court.

I am authorized to state that Justice LAVENDER and Justice HARGRAVE join with me in the views expressed above.