No. 95-132

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

IN THE MATTER OF THE ADOPTION
OF JESSICA LYNN RIFFLE

FILED

SEP 1 3 1995

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Tenth Judicial District,
               In and for the County of Fergus,
               The Honorable Peter L. Rapkoch, Judge presiding.


COUNSEL OF RECORD:

        For Appellants:

            Monte J. Boettger, Attorney at Law, Lewistown,
            Montana

            Ann Gilkey, Department of Family Services, Helena,
            Montana

            Ronald Arneson, Attorney at Law, Billings, Montana

        For Respondents:

            Jerrold Nye, Attorney at Law, Billings, Montana

                        _____


                        Submitted on Briefs:   July 28, 1995

                                   Decided:   September 13, 1995

Filed:

                        _____
                                    Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Appellants John Garlick, Montana Department of Family Services and Turtle Mountain Band of Chippewa appeal the decision of the Tenth Judicial District Court, Fergus County, granting the petition of respondents Kenneth and Clara Siroky for adoption of Jessica Lynn Riffle. We reverse and remand.

We find the following issue dispositive on appeal:

Did the District Court err in determining that Jessica was not an "Indian child" pursuant to the Indian Child Welfare Act (ICWA)?

The facts relevant to the issue addressed in this opinion are as follows: Jessica Lynn Riffle (Jessica) was born on July 14, 1988, to Mary Garlick Riffle and Gary D. Riffle. Jessica is 1/8 Chippewa Indian. Jessica's natural parents struggled with alcohol and drug abuse as well as domestic violence. These problems made it difficult for her parents to properly care for Jessica. Jessica spent much time with her extended family, including her grandmother, Dorothy Garlick and her uncle, John Garlick.

In May 1990 the Montana Department of Family Services (DFS) removed Jessica from her mother's care and placed her in the foster care of Kenneth and Clara Siroky. DFS returned Jessica to her mother in December of 1990. DFS again removed Jessica from her mother's care in June 1991 and returned her to the foster care custody of the Sirokys where she has remained.

On August 4, 1992, the Turtle Mountain Band of Chippewa (the Tribe) was notified of the impending termination of Mary Riffle's parental rights. The Tribe was again notified on December 16,

2

1992. The Tribe took no immediate action. On September 28, 1993, the Tenth Judicial District Court terminated Mary and Gary Riffle's parental rights and awarded DFS permanent custody of Jessica.

DFS commenced adoption proceedings, seeking to find a suitable adoptive parent for Jessica. John Garlick sought custody of Jessica and on May 5, 1993, petitioned for her adoption. DFS concluded that John Garlick was a suitable adoptive parent and consented to his adoption of Jessica. On May 3, 1994, the Sirokys petitioned the court for Jessica's adoption. On May 26, 1994, shortly before John was to receive custody of Jessica, the Sirokys obtained a temporary restraining order preventing Jessica's removal from their custody.

On May 15, 1994, prior to the District Court's determination of Jessica's custody, the Tribe moved the court's permission to intervene in the proceedings. On May 20, 1994, the court preliminarily granted the Tribe's motion. However, on July 27, 1994, the court adopted the Bureau of Indian Affairs' (BIA) opinion that Jessica was not an "Indian child" pursuant to ICWA and therefore ICWA did not apply to these proceedings.

On November 14 and 15, 1994, the District Court heard the arguments of petitioner John Garlick and petitioners Kenneth and Clara Siroky concerning their respective desires to adopt Jessica. On December 12, 1994, the District Court issued its findings of fact, conclusions of law, and order granting the Sirokys' petition for adoption. John Garlick, DFS and the Tribe appeal the decision of the District Court.

3

Did the District Court err in determining that Jessica was not an "Indian child" pursuant to ICWA?

In its July 27, 1994, order, the District Court concluded that Jessica was not an "Indian child" pursuant to ICWA and, therefore, the provisions of ICWA were not applied to these proceedings. The court concluded that the Tribe was given the opportunity to intervene in these proceedings, yet failed to indicate whether it considered Jessica eligible for tribal membership. The court proceeded to conclude that the BIA's determination that Jessica was not eligible to become a member of the Tribe was conclusive. The court held that, even if the Tribe was allowed to intervene later in the proceedings, the BIA's determination could not be rebutted. In reference to the BIA's determination that Jessica lacked sufficient blood quantum to be considered for Tribal membership, the court stated:

> It is significant that the Bureau's determination is in the present tense. That is because the disqualifying act "insufficient blood quantum", that is, not enough Indian blood, is an objective, permanent condition. It is not a condition based upon procedural steps or missteps or nonsteps of the parties.

The court reiterated its conclusion that Jessica was not eligible for membership in the Tribe and therefore not an "Indian child" in its December 12, 1994 findings of fact and conclusions of law concerning the parties' respective petitions for adoption. We review district court conclusions of law to determine whether the court's interpretation of law was correct. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

4

ICWA contains a policy statement that encourages tribal input and participation in custody proceedings involving Indian children. Title 25 U.S.C. § 1902 states:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

One of the "minimum federal standards" promulgated by ICWA is found in 25 U.S.C. § 1911(c), which provides, "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and <u>the Indian child's tribe shall have a right to intervene at any point in the proceeding</u>." (Emphasis added.)

We note that on May 20, 1994, the District Court granted the Tribe's motion to intervene. However, on July 27, 1994, the court determined that the Tribe failed to <u>promptly</u> intervene after receiving notice of the proceedings. The court concluded that the Tribe's failure to promptly intervene after receiving notice of the proceedings waived the Tribe's right to intervene at a later date. Regardless of the procedural peculiarities of the District Court's actions, we will address the Tribe's asserted right to intervene in these proceedings.

We find no support in ICWA for the court's conclusion that the Tribe waived its right to intervene. While 25 U.S.C. § 1912 establishes notice requirements which must be fulfilled before

5

proceedings may go forward, this section does not indicate that the Tribe's right to intervene is impaired if it does not intervene promptly after receiving such notice.

In In the Matter of the Guardianship of Q.G.M. (Okl. 1991), 808 P.2d 684, the Oklahoma Supreme Court concluded that an Indian tribe could not waive its right to intervene merely by failing to intervene within the time provided by 25 U.S.C. § 1912. In resolving this issue, the court explained:

> [T]he grandparents argue that the tribe waived its rights when it neither responded nor requested additional time to prepare for the guardianship proceeding which is permitted by 25 U.S.C. § 1912(a) (1978). [Footnote omitted.] Although we might agree with the grandparent's [sic] position, we are precluded from doing so by 25 U.S.C. § 1911(c) . . . .
>
> As a matter of statutory analysis, the Court must give effect to the Act. We cannot ignore the plain words of a statute. [Footnote omitted.] The statute allows the tribe to intervene at any point in the proceeding . . . . Even if a tribe fails to intervene at the beginning of a proceeding, it is not precluded from intervening at a later point in the absence of an express waiver of the right to intervene. A waiver of rights by the tribe should not be inferred. [Footnote omitted.]

Guardianship of Q.G.M., 808 P.2d at 688-89.

We agree with the Oklahoma Supreme Court's interpretation of ICWA. Section 1911(c) provides that a tribe can intervene "at any point in the proceeding." Absent express statutory language to the contrary, we conclude that the Tribe must be allowed to intervene in these proceedings.

The District Court went on to conclude that, regardless of whether the Tribe was or was not allowed to intervene, Jessica's status would not be affected. Based on the BIA's determination,

6

the court concluded that Jessica lacked sufficient blood quantum to ever be considered a member of the Tribe and thus an "Indian child" under ICWA.

Blood quantum does not dictate whether or not an individual is to be considered an "Indian child" pursuant to ICWA. ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

The Department of the Interior has promulgated Guidelines for State Courts (Guidelines) to aid in the interpretation and application of ICWA. This Court has previously determined that the Guidelines, while not binding, are persuasive and should be looked to in interpreting ICWA. In the Matter of M.E.M. (1981), 195 Mont. 329, 336, 635 P.2d 1313, 1318.

Section B.1.(b)(ii) of the Guidelines states:

> Absent a contrary determination by the tribe that is alleged to be the Indian child's tribe, a determination by the Bureau of Indian Affairs that a child is or is not an Indian child is conclusive.

The District Court, relying on this language, concluded that the BIA's determination that Jessica lacked sufficient blood quantum to be an "Indian child" was conclusive. However, this provision does not require a <u>prior</u> contrary determination by the Tribe to render the BIA determination ineffectual. Rather, it merely requires a contrary determination by the Tribe. The immediately preceding section of the Guidelines, § B.1.(b)(i), states:

7

> The determination by the tribe that a child is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive.

Thus the Tribe, and not the BIA, is the ultimate authority on eligibility for tribal membership.

We hold that the District Court erred in determining that the Tribe waived its right to intervene in these proceedings. We further hold that, under these circumstances, the District Court's reliance on the BIA's determination that Jessica is ineligible for membership in the Tribe and therefore not an "Indian child" was incorrect.

We conclude that ICWA is applicable to these proceedings and reverse and remand for a determination of whether Jessica is an "Indian child" pursuant to 25 U.S.C. § 1903(4).

_____
Chief Justice

We concur:

_____

_____

_____
Justices

8

Justice James C. Nelson specially concurs.

While I concur fully in our analysis and in the result of our opinion in this case, I am, nevertheless, compelled to make an observation concerning the Tribe's failure to intervene promptly on being first notified of these proceedings in August, 1992.

It can hardly be denied that the application of the ICWA to a child custody proceeding will likely dictate the child's temporary and permanent placement, and, perhaps, exclude persons involved in the child's life who might otherwise be eligible to be custodians or adoptive parents were the Act not controlling. Given that the goal of any child custody proceeding should be to restore the child to or to place the child in a permanent, stable, nurturing environment as expeditiously as possible, the failure of any person or governmental entity or agency--whether tribal or non-tribal--to promptly discharge a right or duty of participation in such a proceeding cannot not be condoned.

I appreciate that a Tribe may not immediately respond to the notice of or intervene in a child custody proceeding because in the early stages it may appear that the likely placement of the child by the State agency and court will be acceptable to the Tribe and to the Native American family members who have priority under the Act. This is all the more true because a substantial number (some 60%, in Montana) of Tribal members and their extended families reside in communities outside their reservation and may not have close ties with their Tribal government, institutions and social support. Accordingly, it may not be immediately apparent to a Tribe that it should become involved in a particular child custody

9

proceeding.

Nonetheless, if, as in this case, circumstances cause the Tribe to intervene in the proceeding at a late stage (here, nearly two years after the initial notice), the net result may be additional litigation and substantial delay in the ultimate resolution of the child's placement. In the usual child custody proceeding where, almost by definition, the child's life already lacks stability and has been seriously disrupted and where the child may have special needs, adding more delay and litigation to an already cumbersome process is simply not acceptable from the standpoint of either the child or the parties involved.

Without criticizing the motives or procedures of the Tribe in this case, I, nevertheless, submit that the early and vigorous participation of the Tribe in all child custody proceedings subject to the Act, whether such participation may, initially, appear to be necessary or not, will ultimately best serve the underlying policies of the ICWA, will ensure that the proceeding will be concluded expeditiously and in accordance with applicable law, and, most importantly, will best serve the paramount right of the child to live in a stable, loving and supportive family environment.

_____
Justice

10