25 Kan. App.2d 268 (1998)
961 P.2d 706
In the Interest of A.P., a Child Under the Age of 18 Years, To-Wit: 07/02/95.
No. 80,164.
Court of Appeals of Kansas.
Opinion filed July 2, 1998.
*269 Craig A. Stancliffe, of Lawrence, for appellant natural mother.
Willow Head, legal intern, David P. Zabel, assistant district attorney, and Christine K. Tonkovich, district attorney, for appellee State of Kansas.
Before ELLIOTT, P.J., MARQUARDT, J., and WAHL, S.J.
WAHL, J.:
Natural mother, C.P., appeals the termination of her parental rights to A.P., alleging that the trial court failed to comply with the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901 et seq. (1994), and that the State failed to produce evidence *270 to prove beyond a reasonable doubt that the child's continued residence with C.P. would result in harm to A.P.
C.P., an enrolled member of the Oglala Sioux Nation, Pine Ridge, South Dakota, was living in Lawrence attending Haskell Indian Nations University when she became pregnant with A.P. A.P. was born prematurely, in distress and in need of special medical attention, on July 2, 1995, in South Dakota. A.P. came to the attention of Kansas juvenile authorities on January 22, 1996, after C.P. left him in the care of a woman in Lawrence whom she barely knew and then failed to return for 2 days. C.P. was contacted by the Department of Social and Rehabilitation Services (SRS), and an investigation was made into the complaint. C.P. reported that she knew the caretaker only through a mutual friend and did not know the caretaker's last name. She left the child an extra 2 days because she was "snowed in" in Kansas City and was unable to get to a phone to call. C.P. knew the caretaker to be under investigation for "smoking weed and being mean to her daughter." The social worker was not allowed to see A.P. when she visited C.P.'s residence. After a conversation with the woman who had taken care of A.P., SRS sought and received emergency protective orders for A.P. He was removed from his mother's custody on February 5, 1996. At that time, A.P. was placed in a foster home with an American Indian parent in Lawrence with whom he stayed throughout the pendency of this proceeding.
SRS began a reintegration plan for the family through a case planning conference on February 21, 1996, at which time C.P. was not present. C.P. visited A.P. on March 29, 1996, for the first time after the February 5 removal. Visits were scheduled for April 11, 19, 24, and May 2 while C.P. was to be receiving inpatient alcohol treatment from the Women's Recovery Center in Topeka. C.P. attended all but one of these supervised visits. On one occasion, she used the SRS voucher to travel from Topeka to Kansas City rather than to Lawrence. She reported to the social worker in early May that she had completed treatment and would be available for regular visits scheduled for Fridays. A review of the dates of visitation reveals that C.P. arrived for scheduled visits about three times a month and then she would fail to appear for a visit. In all, *271 during the year after A.P. was removed from her care, C.P. visited the child 17 times. During the period August 9, 1996, through January 17, 1997, C.P. made no visits or attempted any contact with the child. When she did visit after this prolonged absence, A.P. did not recognize C.P.
C.P. did not complete the treatment program at the Women's Recovery Center as she reported she had, partly because of a lack of dedication to the program and conflicts with the staff. She was later offered an opportunity to receive inpatient treatment at the Choctaw Nations Treatment Center, but she also had conflicts with the staff at that facility. C.P. received individual counseling with Dr. Suzanne Lange of Haskell Indian Nations University. Dr. Lange is a clinical psychologist with extensive experience in the culture of the Sioux people. C.P. was seeing Dr. Lange before A.P. was born, but was not consistent in her attendance of sessions. C.P. saw Dr. Lange a total of 22 times, 8 times during 1996, but attended no sessions after July 11, 1996, even though Dr. Lange was available for appointments after that date. The therapy was not considered successful, and Dr. Lange's professional impressions were as follows: C.P. was not a capable mother because of her problems with alcohol dependence and her habit of getting involved with violent relationships; it would take 2 years of intensive therapy after successful completion of alcohol abuse treatment for C.P. to be a functional, good parent; C.P. would present a danger to A.P., albeit not intentionally, because of her heavy alcohol abuse; C.P.'s neglect of A.P. was not a function of her cultural distinctiveness as an American Indian.
Evidence was presented by Marcia Seagraves, a drug and alcohol counselor at Haskell, Dr. Jean Dirks, a psychologist at Bert Nash Community Mental Health Center, and Andy Jackson, program director at Haskell Health Center Drug and Alcohol Program. All of these experts concluded that C.P. had a severe alcohol abuse problem, that she was untruthful, and that she failed to complete any treatment options available to her prior to February 1997, when the petition for termination of parental rights was filed. Social worker Sherri Williams detailed the efforts made by SRS to reintegrate *272 A.P. with his natural mother. Efforts were also made to coordinate treatment through tribal authorities at Pine Ridge.
C.P. presented evidence by Dr. Dennis Karpowitz, a clinical psychologist. Dr. Karpowitz has treated American Indians in his private practice and has written articles on parenting and parenting evaluations. Dr. Karpowitz was qualified as a psychological expert with the court to determine the extent of his knowledge of American Indian issues. Dr. Karpowitz testified that he was acquainted with C.P. prior to his evaluation of her because they attended the same church in Lawrence. He did not believe the association between C.P. and himself through the church colored his recommendation. Dr. Karpowitz suggested the trial court place A.P. with an organization from the Pine Ridge Reservation until C.P. was able to assume her duties as a parent; however, he had never contacted the organization to determine whether the proposal was a feasible one. The district attorney's office sent notice to the office recommended by Dr. Karpowitz, but the record reveals no response.
Cheri Brown, LCSW, also testified for C.P. Ms. Brown met with C.P. for three sessions and reported that C.P. was alcohol free after those sessions. This assessment was based on C.P.'s self-report. Prior to Ms. Brown's meetings, C.P. met with a different social worker at the same clinic for six sessions. Ms. Brown wrote a letter to the court dated July 23, 1997, indicating that C.P. had completed outpatient treatment through Bert Nash Community Mental Health Center. That letter is not included as part of the record on appeal, but it is appended to appellant's brief. Although appending the letter to the brief does not bring it into the record on appeal, it is also not very informative.
When A.P. was removed from C.P.'s care, he was 7 months old, but he could not sit up or crawl and, thus, was not typically developed for his age. At the April 19, 1996, child in need of care adjudication, A.P. was directed to be enrolled with a special needs schooling through the University of Kansas, where he received occupational therapy, physical therapy, and speech and language services. Less than 1 year later, A.P. had physically "caught up" to his peer group but was still exhibiting some characteristics of a *273 special needs child. According to some evaluators, A.P. suffers from fetal alcohol syndrome as a result of C.P.'s alcohol use during her pregnancy.
After hearing all the evidence, the district court terminated the putative fathers' rights to A.P. The fathers were represented by counsel, but counsel had no contact with them. They were properly served by publication, and the termination as to the fathers is not appealed.
The court also terminated C.P.'s parental rights to A.P., finding beyond a reasonable doubt that the continued custody of A.P. by C.P. is likely to result in serious emotional or physical damage to the child. The court further cited multiple efforts made by SRS and Haskell's mental health professionals to prevent the breakup of this family.
A.P. is an enrolled member of the Oglala Sioux Nation and is the child of an enrolled member. Because of A.P.'s Indian heritage, custody proceedings involving A.P. implicate the ICWA. It is necessary first to consider the statutory scheme of the ICWA, what it is designed to protect, and how it is to be applied in state court to a termination of parental rights case.
The ICWA was passed in 1978 in response to the increasingly high number of American Indian children who were being adopted by non-Indian parents and were being raised apart from the cultural heritage that accompanies the special status American Indians occupy in this country. Information presented to the Senate in support of the legislation indicated that 25-35 percent of American Indian children had been taken from their families and placed in foster care, adoptive homes, or boarding schools. In some states, the rate of placement outside an American Indian community was as high as 90 percent for Indian children removed from their birth families. Mississippi Choctaw Indian Band v. Holyfield, 490 U.S. 30, 32-33, 104 L. Ed.2d 29, 109 S. Ct. 1597 (1989). Studies revealed that some state agencies disregarded cultural and social standards prevailing in an American Indian community when making removal and placement decisions regarding American Indian children. 25 U.S.C. § 1901(4) and(5) (1994).
*274 The ICWA was passed for the furtherance of the best interests of tribal children and to promote security in both families and tribes of American Indian people. 25 U.S.C. § 1902 (1994). In any proceeding involving custody of a child of Indian heritage, the court must determine whether the ICWA governs the proceeding. If a child is an enrolled member of a tribe or is the biological child of an enrolled member and is eligible for membership, the ICWA applies. 25 U.S.C. § 1903(4) (1994). The tribe's determination of membership or membership eligibility is conclusive and final. Adoption of Riffle, 273 Mont. 237, 242, 902 P.2d 542 (1995), appeal after remand 277 Mont. 388, 922 P.2d 510 (1996).
The ICWA establishes both jurisdictional and substantive procedure for custody determination of Indian children. The jurisdiction section provides for tribal court jurisdiction of custody cases involving reservation-domiciled children and wards of the tribe. 25 U.S.C. § 1911(a) (1994). Concurrent jurisdiction exists with state courts over children not domiciled on the reservation. Cases involving these children should be transferred to the tribal court unless certain exceptions apply. 25 U.S.C. § 1911(b) (1994). The tribe can intervene at any time in the proceedings to insure that the interest of the tribe is protected. 25 U.S.C. § 1911(c); Adoption of Riffle, 273 Mont. at 240-41.
Before an Indian parent's or custodian's rights to a child can be terminated, a finding must be made that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (1994). Termination may be ordered only where the court is satisfied beyond a reasonable doubt, supported by the "testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (1994).
State court application of the federal protective measures of the ICWA is in furtherance of the State's duty to "preserve the unique cultural heritage and integrity of the American Indians." Adoption of Riffle, 277 Mont. at 393.
*275 The transfer of a termination case to the tribal court is governed by 25 U.S.C. § 1911(b). A state court must transfer a proceeding involving an Indian child not domiciled within the reservation to the tribal court of which the child is a member except in one of three circumstances: (1) an express declination by the tribal court; (2) objection by either parent to the transfer; or (3) good cause not to make the transfer. In the instant case, there was no express declination and C.P. actively sought to have the case transferred, so the only circumstance under which it was appropriate for the district court to exercise jurisdiction over this termination case is upon a finding of good cause not to transfer the case to the tribal court.
The ICWA makes no definition of "good cause" to refuse a transfer request, however, the Bureau of Indian Affairs (BIA) has adopted criteria to be used in a good cause determination:
"(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the Act to which the case can be transferred.
"(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:
(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
(ii) The Indian child is over twelve years of age and objects to the transfer.
(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.
(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe." 44 Fed. Reg. 67,591 (1979).
In the instant case, the district court found that good cause existed to retain jurisdiction because all material witnesses were located within Kansas and, despite repeated efforts by the district attorney's office, the tribal court failed to assert any interest in having the case transferred. An affidavit filed by the district attorney's office indicates multiple attempts to determine the tribe's intent regarding the proceedings, and no effort was made at intervention. The tribe intervened in the original child in need of care case involving A.P., but declined to become involved in the instant *276 case. This indicates that the tribe was aware of the case and tacitly elected not to intervene in the proceeding. This failure to intervene cannot, of itself, be considered a declination of jurisdiction, but can be used to support a finding of good cause not to transfer the case. See Matter of Guardianship of Q.G.M., 808 P.2d 684, 689 (Okla. 1991).
Without explicit citation to the Federal Register, the trial court made sufficient findings of fact to support both of the guidelines for good cause that could be applied to this case. The motion was made at a late stage of the proceeding and witnesses relevant to the termination of C.P.'s rights are located in Kansas. The child has spent the vast majority of his life in foster care in Kansas, and, therefore, the Kansas witnesses are more relevant to the disposition of this case than witnesses who might exist in South Dakota. For all to travel to Pine Ridge, South Dakota, would be an undue hardship on the witnesses. See Matter of Wayne R.N., 107 N.M. 341, 344, 757 P.2d 1333 (Ct. App. 1988) (reasons to decline transfer include the location of witnesses, adoptive parents, and biological parents); see also In re Adoption of Baby Boy L., 231 Kan. 199, 210, 643 P.2d 168 (1982) (to require the witnesses located in Sedgwick County to travel to Oklahoma constituted "good cause not to transfer such proceedings").
The standard for reviewing a district court's refusal to transfer a case to the tribal court has not been addressed by Kansas courts. Appellant contends the standard is proof beyond a reasonable doubt. She provides no citation to case law in support of this contention, and the plain language of the statute does not indicate such a standard. Some courts have determined that the appropriate standard to apply is abuse of discretion. People in Interest of J.L.P., 870 P.2d 1252, 1256-57 (Colo. App. 1994). Other states have held that the determination must be supported by clear and convincing evidence of good cause. Matter of Custody of S.E.G., 507 N.W.2d 872, 878 (Minn. App. 1993), rev'd on other grounds 521 N.W.2d 357 (Minn. 1994), cert. denied 513 U.S. 1127 (1995). Upon review of the congressional intent, we conclude the standard most consistent with the ICWA requires clear and convincing evidence of good cause for a state trial court to refuse to transfer to the tribal court.
*277 On appeal, the record is reviewed for substantial competent evidence to support the trial court's decision that good cause existed not to transfer the case to the tribal court. A similar standard of review is applied in termination of parental rights cases under Kansas law. See In re S.M.Q., 247 Kan. 231, 234, 796 P.2d 543 (1990). Here, the evidence adduced at the hearing of this matter provided substantial competent evidence from which the trial court could conclude that good cause existed to refuse to transfer the case to the tribal court. The trial court's exercise of jurisdiction was proper. 25 U.S.C. § 1911(b).
Before an Indian parent's legal relationship to his or her child may be terminated, the trial court must be convinced beyond a reasonable doubt that continued custody by the Indian parent will likely result in "serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). This standard is more stringent than the requirements for termination of the rights of non-Indian parents under state law. See K.S.A. 1997 Supp. 38-1583, which requires proof by clear and convincing evidence of parental unfitness.
The federal ICWA standard has been interpreted by some state courts to require a dual burden of proof. First, the court must determine by clear and convincing evidence that the state law provisions for termination are satisfied and then turn to the more stringent standard under the ICWA to determine whether the petitioner has proved beyond a reasonable doubt that custody by the natural Indian parent would likely result in damage to the child. In re Bluebird, 105 N.C. App. 42, 47, 411 S.E.2d 820 (1992). Other courts have held that the federal standard adopted in the ICWA supplants the state standard and the only criteria applicable are enumerated in 25 U.S.C. § 1912(f). See People in Interest of C.A.J., 709 P.2d 604, 606 (Colo. App. 1985); People in Interest of P.B., 371 N.W.2d 366, 371-72 (S.D. 1985).
We deem the approach most practical to be the one adopted by North Carolina, which involves a two-step process, first applying the test established under state law for termination of parental rights, and then applying the standard from the ICWA. This approach does not require that the state law elements for termination be proved beyond a reasonable doubt, but provides a framework *278 from which the trial judges and practicing attorneys are accustomed to working. K.S.A. 1997 Supp. 38-1583 and K.S.A. 1997 Supp. 38-1585 give specific enumerated circumstances for termination when proved by clear and convincing evidence.
In the instant case, the district court specifically applied the facts as presented to the termination statutes under Kansas law. These criteria were used to support beyond a reasonable doubt the conclusion that continued residence with C.P. would likely result in severe harm to A.P. The court went even further than required by statute and found that the numerous elements of the state law were proved beyond a reasonable doubt. The standard of review in a case of this nature is whether there is substantial competent evidence in the record to support the trial court's decision that the parent is unfit and that the parental rights should be terminated. In re S.M.Q., 247 Kan. at 234.
The district court made numerous findings of fact to satisfy the criteria of K.S.A. 1997 Supp. 38-1583(b). C.P. does not challenge these findings of fact on appeal. Findings of fact, unappealed from, are conclusive. Justice v. Board of Wyandotte County Comm'rs., 17 Kan. App.2d 102, 109, 835 P.2d 692, rev. denied 251 Kan. 938 (1992). C.P. is an alcoholic and has failed efforts at treatment because she is uncooperative with officials. Even when she was able to do so, C.P. did not visit A.P. at the prearranged times. At one point there was no contact between C.P. and her son for nearly 6 months. C.P. excessively used intoxicating liquors and neglected the child, at least once returning 3 days late to pick up the infant from a sitter. She further failed to adjust her circumstances to meet the needs of this child. Substantial competent evidence in the record supports the trial court's finding of unfitness as a matter of state law.
To meet the requirements of the ICWA, the district court must find beyond a reasonable doubt that continued custody by the parent is likely to result in serious emotional or physical damage to the child. That finding must be supported by the testimony of an expert witness qualified under the provisions of the ICWA. 25 U.S.C. § 1912(f).
*279 The standard of beyond a reasonable doubt is used for review of sufficiency of the evidence in a criminal case. The same standard applies here: After reviewing all the evidence and considering that evidence in the light most favorable to the petitioner, is the appellate court convinced that a rational factfinder could find beyond a reasonable doubt that the parents' continued custody is likely to result in harm to the child? See In re J.W.S., 250 Kan. 65, 66, 825 P.2d 125 (1992). It is appropriate to consider special needs of the individual child when making this assessment. People in Interest of P.B., 371 N.W.2d at 372.
A.P. is developmentally delayed and suffers the effects of his mother's alcoholism both physically and emotionally. A.P. has some symptoms of fetal alcohol syndrome and is delayed in speech and language development as a result of this disease. When A.P. was just over 1 year old and C.P. never made any contact with the child for nearly 6 months, A.P. did not recognize her when she did again visit him.
C.P. has failed at three different programs of alcohol treatment. She reported to the counselor at a fourth treatment program that she was no longer using alcohol, but there was no verification of her sobriety. C.P. lied to health care providers, babysitters, and SRS officials about her treatment status, her use of alcohol during pregnancy, and her whereabouts at various times. The district court did not err in disregarding certain parts of C.P.'s testimony about her rehabilitation efforts.
C.P.'s visits to her son were always sporadic, and she did not avail herself of the opportunities she had to see A.P. Before A.P. was removed from C.P.'s care, she left him with inappropriate caregivers and did not return for several days to pick up the child. As a part of an integration plan, she indicated that she planned to live with her almost-adult daughter, P.S., who had been convicted of child abuse for shaking her child, causing the child to become blind. C.P. did not indicate how she would change her circumstances to protect A.P. from P.S.
Both Dr. Dirks and Dr. Lange diagnosed C.P. with post-traumatic stress disorder and alcohol dependency. Dr. Lange indicated that C.P. would need 2 years of therapy beyond the time spent in *280 alcohol treatment. Dr. Dirks indicated that C.P. exhibited the symptoms of borderline personality disorder. Both Dr. Lange and Dr. Dirks concluded that C.P. was not willing to change her behavior and that she presented a risk to A.P. of both physical and psychological harm if he were to be returned to C.P.'s custody.
One of the ICWA's purposes is to make judges and attorneys aware of the cultural differences of American Indian people and the differences in child rearing that may arise from an extended family reservation setting, and to remove the prejudice that may arise from the appearance of relative poverty of some Indian communities. However, there is no indication that the intent of Congress when adopting the ICWA was to allow American Indians a license to abuse and neglect their children in the name of cultural differences. Dr. Karpowitz found that cultural factors were largely responsible for C.P.'s apparent irresponsibility in caring for her son. Yet, there is no evidence, in the record or otherwise, that child neglect is a cultural tenet for the Oglala people, and such a conclusion would be insulting to all American Indians.
After review of all the evidence, we conclude that in light of the testimony of several professionals, all of whom qualified as experts in their fields, and some of whom are experts in American Indian culture and child rearing practices, C.P. presented a likelihood of physical and mental harm to A.P. There is sufficient evidence in the record for a rational factfinder to find that such harm was likely beyond a reasonable doubt.
Kansas law requires certain efforts to be made at reintegration of a child into the home. K.S.A. 1997 Supp. 38-1565. Unlike the grounds for termination, the specific requirements of these plans are left largely to the case-by-case determination of need assessment. No specific burden of proof is required in state placement efforts. The ICWA, however, requires that the party seeking termination under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). No burden of proof is established in the statute.
*281 States that have decided this issue have determined that the appropriate standard is clear and convincing evidence of remedial efforts to meet the statutory requirement to satisfy the court. See Matter of Baby Boy Doe, 127 Idaho 452, 457, 902 P.2d 477 (1995). After review of the statutory intent of preserving families, coupled with the higher burden of proof for termination cases, we hold that the clear and convincing standard is appropriate to carry out the congressional policies of the ICWA in reintegrating the child into the child's home. This court then reviews the record from the district court to determine whether substantial competent evidence supports the findings made below. See In re S.M.Q., 247 Kan. at 234.
The trial court heard testimony from two representatives of SRS, three representatives of Haskell Health Center, two persons from Bert Nash Community Mental Health Center, a representative of Women's Recovery Center, a Douglas County probation officer, and a private psychologist who had met with C.P. Of these witnesses, at least seven were able to detail the efforts made by SRS and the federally funded programs through Haskell to help C.P. assume her responsibilities as the parent of A.P. Through Haskell, she was given free mental health services and drug treatment options, arrangements were made for inpatient treatment at a facility in Oklahoma for American Indians, and transportation was arranged and provided for these various services. She did not complete any treatment options provided through Haskell. SRS provided visitation with her child and her grandchild in a supervised setting, travel vouchers to enable visitation, treatment through the Women's Recovery Center, transportation to visits when she was living in Lawrence, and group counseling options. Bert Nash Center provided counseling and alcohol treatment options.
These efforts provide substantial competent evidence that efforts were made to prevent the breakup of this Indian family. C.P. did not complete the treatment options offered soon after her child's removal. The program that she did complete was not of the intensity the mental health professionals indicated was necessary to help C.P. through recovery. All the remedial efforts failed. The *282 district court did not err in finding that remedial efforts were made and were not successful in preventing the breakup of this family.
The judgment of the district court is affirmed.