**In re TAMIKA R.**

**No. 2008–215–Appeal.**

Supreme Court of Rhode Island.

June 30, 2009.

---

548 ■ ■

Thomas J. Corrigan, CASA.

Andrew S. Johnson, East Greenwich, DCYF.

Catherine Gibran, Providence, Office of Public Defender.

Present: GOLDBERG, Acting C.J., and FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (Ret.).

## OPINION

Justice SUTTELL, for the Court.

The respondent, Jackie Robinson, appeals from a Family Court decree finding his daughter Tameka[1] to be dependent and committing her to the care, custody, and control of the Department of Children, Youth and Families (DCYF) with discretion as to placement. He argues that DCYF failed to present expert testimony in compliance with the federal Indian Child Welfare Act (ICWA). Mr. Robinson further argues that the trial justice's finding of dependency was not supported by clear and convincing evidence. Finally, he submits that the trial justice's "prosecutorial manner of questioning" deprived him of a fair and impartial trial. After examining the written and oral submissions of the parties, we are of the opinion that the appeal may be resolved without further briefing or argument. For the reasons hereinafter set forth, we vacate the decree of the Family Court.

## I

### Facts and Procedural History

A member of the Narragansett Indian Tribe, Mr. Robinson is the father of Tame-

1. In his supplemental memorandum, Mr. Robinson informed this Court that the proper spelling of his daughter's name is Tameka. Although she is consistently referred to as Tamika in the Family Court records, we henceforth defer to Mr. Robinson's advisement.

ka, who was born on October 4, 2007. At the time, Mr. Robinson had been living with Eleanor Wilson for over eight years, and they were raising their four children together. Notwithstanding his description of Ms. Wilson as his common-law wife, Mr. Robinson had an affair with another woman, which resulted in Tameka's conception. Tameka's biological mother, who was already supporting four children and feeling unable to adequately care for another child, agreed to place the child with a social-service agency for adoption. At no time, however, did Mr. Robinson indicate that he would consent to an adoption. Rather, he advised a DCYF child protective investigator on October 18, 2007, that he wished to have custody of the baby. He also informed the investigator that, perhaps not surprisingly, Ms. Wilson had demanded he vacate their home upon learning of his liaison. This apparent lack of stable housing prevented Tameka's placement with him, and on October 19, 2007, DCYF filed a petition against both parents citing allegations of dependency and neglect. The Family Court granted DCYF temporary custody on October 26, 2007, and Tameka remained in foster care. Mr. Robinson testified that he had been consistently attending weekly visits with Tameka at DCYF, adding that Ms. Wilson and their four children also had attended the visits for the past two months.

The trial on DCYF's petition was conducted on March 20, 2008. Mr. Robinson admitted that his infidelity initially had rendered Ms. Wilson "heartbroken," but he informed the court that they had reconciled some time before Christmas of the previous year and that he had, in fact, never left the home. Mr. Robinson had difficulty explaining when and even if he

informed DCYF that he and Ms. Wilson had agreed to accept Tameka into their home, but by the time of the trial all parties were aware that Mr. Robinson's housing situation no longer was an issue. According to Mr. Robinson, at DCYF's request he attended CODAC, a drug treatment facility, where he submitted urine screens and received substance-abuse counseling.[2] Although at trial he denied having a drug problem, Mr. Robinson tested positive for marijuana and admitted that he had told his substance abuse counselor, "I can't stop, it's part of my life[.]" He later discontinued the drug-counseling program, stating that he felt he did not belong there and that it was "belittling" to take the urine screens in front of other men.

The trial justice also questioned Mr. Robinson's financial resources. Mr. Robinson testified that he recently lost a job as a dishwasher because a car accident had left him partially disabled. He stated that he had applied for Social Security disability benefits, and acknowledged that all four of his children received some form of public assistance.

Mr. Robinson's attorney averred during his closing argument that DCYF had failed to establish dependency by clear and convincing evidence. He also raised DCYF's failure to submit testimony of a qualified expert witness, in accordance with the provisions of the ICWA, tending to show that an award of custody to Mr. Robinson would result in serious emotional or physical harm to Tameka. The trial justice initially considered reopening the case to allow DCYF to submit the necessary testimony; but, after further argument by the state, he decided that Mr. Robinson's testimony "supersedes an expert."

2. At trial, Mr. Robinson testified that DCYF required him to attend CODAC out of a mistaken belief that he "had a record." On appeal, he now states that he was asked to attend CODAC after he "candidly told the caseworker that he smoked marijuana."

The trial justice issued his decision from the bench. The trial justice found that, despite Mr. Robinson's evasive answers, there was no doubt that he was using marijuana. He also stated that Mr. Robinson's work history "doesn't impress the court" and emphasized that "the family is being supported at this time by welfare benefits, social security benefits, disability benefits, whatever they are. Nobody is working to support this family." The trial justice concluded that there was clear and convincing evidence of Mr. Robinson's dependency, and he committed Tameka to the care, custody, and control of DCYF. He specified that the case plan include "generous" visitation to facilitate reunification, but he instructed DCYF to ensure that Mr. Robinson and not Ms. Wilson would be the primary caretaker of Tameka during visitations. He further required Mr. Robinson to submit to random drug screens. An initial decree was entered on April 9, 2008, but a second decree was entered on April 23, 2008, which added the trial justice's finding that DCYF had "made reasonable efforts to facilitate reunification as to father." Mr. Robinson timely appealed.

On appeal, Mr. Robinson renews his argument that DCYF"s failure to present expert testimony in compliance with the ICWA required the trial justice to dismiss its dependency petition. He also asserts that DCYF failed to submit clear and convincing evidence of dependency. Finally, Mr. Robinson questions the trial justice's fairness and impartiality at trial.

## II

### Standard of Review

Our standard of review in this case is well settled. The "Family Court's * * * findings are entitled to great weight and will not be disturbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived." *In re Ephraim L.*, 862 A.2d 196, 200 (R.I.2004) (quoting *In re Nicole B.*, 703 A.2d 612, 615 (R.I.1997)). "We must search the record to determine whether legally competent evidence supports the trial justice's findings." *Id.* (citing *In re Nicole B.*, 703 A.2d at 615). We review questions of statutory construction, however, de novo. *Mumma v. Cumberland Farms, Inc.*, 965 A.2d 437, 441 (R.I. 2009).

## III

### Discussion

Recognizing that "there is no resource * * * more vital to the continued existence and integrity of Indian tribes than their children," 25 U.S.C. § 1901(3), the ICWA sets forth a clear statement of Congressional policy concerning "the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people." 25 U.S.C. § 1901. The ICWA embodies Congress's response to its findings:

"that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

" * * * that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(4) and (5).

The ICWA establishes "minimum Federal standards for the removal of

Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902. Specifically, 25 U.S.C. § 1912(e) provides:

> "No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Thus, the ICWA imposes two interrelated requirements. First, a state agency must prove by clear and convincing evidence that continued custody "is likely to result in serious emotional or physical damage to the child." *Id.* Second, the ICWA requires that any foster care placement order be supported, at least in part, by testimony from "qualified expert witnesses."[3] *Id.* These dual requirements ensure that "Indian child welfare determinations are not based on 'a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.'" *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (quoting H.R.Rep. No. 95–1386 at 24 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7350, 7546).

There is no dispute that at the time of trial Tameka was eligible for membership in the Narragansett Indian Tribe. DCYF, therefore, was obliged to comply with the provisions of the ICWA. *See Steven H. v. Arizona Department of Economic Security,* 218 Ariz. 566, 190 P.3d 180, 186 (2008) (applying ICWA standards to state dependency hearing). DCYF concedes that it did not adhere to the mandatory requirements of 25 U.S.C. § 1912(e), but it argues that this error was harmless beyond a reasonable doubt. *See In re Enrique P.,* 14 Neb.App. 453, 709 N.W.2d 676, 690 (2006) (failure to provide qualified expert witness was harmless when psychological evaluation and case-workers' court reports clearly and convincingly showed that parental custody would result in serious damage to child); *In re G.F., G.F. & J.F.,* 181 Vt. 593, 923 A.2d 578, 580–82 (2007) (failure of trial justice to make specific findings under 25 U.S.C. § 1912 was harmless error when evidence overwhelmingly supported findings). DCYF reasons that, because the trial justice articulated "culturally neutral" reasons for making his findings, "nothing an expert could have offered by way of opinion would have outweighed" the evidence of Tameka's dependency. To support its contention, DCYF cites two cases defining "qualified expert witness" expansively. *See People ex rel.*

---

**3.** The United States Department of the Interior, Bureau of Indian Affairs has promulgated "Guidelines for State Courts; Indian Child Custody Proceedings." 44 Fed.Reg. 67,584–95 (Nov. 26, 1979). Although they have no binding legislative effect, they are useful in interpreting the ICWA. The guidelines describe a "qualified expert witness" as follows:

"(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

"(i) A member of the Indian child's tribe who is recognized by the tribal community

as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty." *Id.* at 67,593 (D.4 Qualified Expert Witnesses).

*K.D.,* 155 P.3d 634 (Colo.Ct.App.2007); *State ex rel. Juvenile Department of Lane County v. Tucker,* 76 Or.App. 673, 710 P.2d 793 (1985). In both cases, however, the social-service agency did present expert testimony that continued custody would likely result in serious emotional or physical damage to the child. *See People ex rel. K.D.,* 155 P.3d at 638 (qualified expert need not possess special knowledge of Indian life where she is testifying about culturally neutral reasons for termination and where she has substantial education and experience in her field); *Tucker,* 710 P.2d at 799 ("when cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life"); *see also Steven H.,* 190 P.3d at 185–86 (expert cannot simply testify to past abuse but must specifically speak to the likelihood of future harm).

In the case before us, we simply cannot say that the failure to comply with the dictates of the ICWA was harmless error. We first note that DCYF failed to present any evidence that custody and placement with Mr. Robinson would likely result in serious emotional or physical harm to Tameka. The initial impediment to Mr. Robinson's custody, *viz.,* his supposed lack of adequate housing, had long since dissipated by the time of trial. He never, in fact, left the home he shared with Ms. Wilson, and it was well known to DCYF that Ms. Wilson had been visiting with Tameka and was very willing to make the child part of their family.

We also are not convinced that Mr. Robinson's use of marijuana is sufficiently "culturally neutral" as to vitiate the need for testimony from a qualified expert witness. Qualified expert testimony may well have been helpful in assessing the seriousness and cultural relevance of Mr. Robinson's marijuana use. *See* "Guidelines for State Courts; Indian Child Custody Proceedings," 44 Fed.Reg. 67,584–95, 67,592 (Nov. 26, 1979) (suggesting "[e]vidence that only shows the existence of community or family poverty, crowded or inadequate housing, alcohol abuse, or non-conforming social behavior does not constitute clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the child") (D.3(c) Standards of Evidence); *see also L.G. v. State Department of Health and Social Services,* 14 P.3d 946, 952–53 (Alaska 2000) ("Legislative history indicates that the primary reason for requiring qualified expert testimony in ICWA termination proceedings was to prevent courts from basing their decisions solely upon the testimony of social workers who possessed *neither* the specialized professional education *nor* the familiarity with Native culture necessary to distinguish between cultural variations in child-rearing practices and actual abuse or neglect."). Significantly, the trial justice did not order drug-abuse counseling for Mr. Robinson; rather, he merely ordered random screening at the Family Court twice a week for the first month and once a week thereafter if the screens were negative for the first month. The trial justice said he would reassess the need for a drug-abuse evaluation at the end of three months. Moreover, any suggestion that Mr. Robinson's marijuana use was likely to result in "serious emotional or physical damage" to Tameka is belied by the fact that DCYF made no attempt to remove the four other children then living with him. We are satisfied that the trial justice overlooked the clear mandate of the ICWA when he stated that Mr. Robinson's testimony "supersedes an expert."

Under the circumstances of this case, we are not at all certain that the outcome would have been the same had DCYF complied with the ICWA. DCYF concedes that "its failure to call an expert witness at

trial was clearly violative of § 1912(e)," but maintains the error was harmless. The trial justice committed the child to DCYF for foster placement in the absence of testimony from a qualified expert witness, and he failed to make the requisite finding that placement with Mr. Robinson would likely result in serious emotional or physical damage to the child. In light of such disregard of ICWA requirements, we cannot say that the error was harmless.

Mr. Robinson further argues that his appeal should be granted because the trial justice "exhibited a state of mind such that he would not have given the respondent a scrupulously fair and impartial trial." We have reviewed the record and find this argument to be without merit.

### IV

### Conclusion

For the reasons set forth in this opinion, we vacate the decree of the Family Court finding Tameka to be a dependent child, and we remand the record for a new trial. We are mindful that Mr. Robinson and Tameka have been separated during a crucial period in the development of the bond between father and daughter and that circumstances may have changed since this matter was heard at trial on March 20, 2008. We are also cognizant of DCYF's obligation to make reasonable efforts to preserve and reunify families consistent with the provisions of the Indian Child Welfare Act. We direct, therefore, that the case be retried or resolved as expeditiously as possible, but no later than within ninety days from the date of this opinion.