Nos. 116,155
116,156
116,157
116,158
116,159
116,160

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTEREST OF L.M.B., A.B., and L.B.,
MINOR CHILDREN.

SYLLABUS BY THE COURT

1.

When the State seeks to terminate parental rights to an Indian child, the federal Indian Child Welfare Act requires proof beyond a reasonable doubt and support by expert testimony that continued parental custody would likely result in serious emotional or physical damage to the child. See 25 U.S.C. § 1912(f) (2012).

2.

To determine whether an expert witness is qualified under the Indian Child Welfare Act, the court should consider guidelines issued by the Bureau of Indian Affairs.

3.

When the State seeks to terminate parental rights to an Indian child, the federal Indian Child Welfare Act also requires that the State show that it has used active efforts to prevent the breakup of the Indian family. See 25 U.S.C. 1912(d) (2012). The State need not have made every possible effort, but its actions may not be merely passive ones, such as offering services and leaving it entirely up to the parent to take any further steps.

4.

The State must show that it has used active efforts by clear and convincing evidence.

5.

The failure to meet a procedural requirement of the Indian Child Welfare Act is subject to the traditional harmless-error rule, under which errors that do not affect a party's substantial rights are not sufficient to merit reversal.

6.

The qualifications of the expert witness in this case, who was a member of the tribe of the involved children, has a PhD in Native American History, teaches Indian studies, and teaches classes on the Indian Child Welfare Act, met the requirements to be an expert witness under the Indian Child Welfare Act.

7.

On the facts of this case, the State presented sufficient evidence, supported by the opinion of a qualified expert, to show beyond a reasonable doubt that continued parental custody would likely result in serious emotional or physical damage to the child; the State presented clear and convincing evidence that it used active efforts to prevent the breakup of the Indian family; and the error of not having a qualified expert testify at the first, or adjudication, stage of the proceeding was harmless error.

Appeal from Kiowa District Court; SIDNEY R. THOMAS, judge. Opinion filed June 16, 2017. Affirmed.

*Michael K. Johnston*, of Johnston, Eisenhauer, Eisenhauer & Lynch, LLC, of Pratt, for appellant natural mother.

*Sarah Bootes Shattuck*, of The Shattuck Law Office, LLC, of Ashland, for appellant natural father.

*Chay Howard*, assistant county attorney, and *J. Scott James*, county attorney, for appellee.

Before LEBEN, P.J., PIERRON and BRUNS, JJ.

LEBEN, J.: R.B. is the mother and D.B. the father of three minor children, L.M.B., A.B., and L.B. All three children are members of the Citizen Potawatomi Nation. In November 2014, the children were removed from their parents' home after another family member reported that the parents were injecting methamphetamine in their basement and Father had sexually assaulted her. Eventually, in May 2016, the district court terminated Mother's and Father's parental rights, and they challenge that termination in this appeal.

First, they argue that the evidence wasn't sufficient to support the termination of their parental rights. But reviewing all of the evidence in the light most favorable to the State (as we are required to do since the factfinder, the district court, determined the facts in favor of the State's position), the district court could have reasonably concluded that remaining in their parents' custody would be likely to cause serious emotional or physical damage to the children. The parents also challenge whether the State's expert witness was in fact qualified under the Indian Child Welfare Act. But according to the guidelines put out by the Bureau of Indian Affairs, the expert was qualified because he was a member of the same tribe as the children and had a PhD in Native American history, so he was well equipped with specific knowledge of the Indian tribe's culture and customs related to childrearing and family organization.

Next, the parents argue that the State didn't use active efforts, as required by the Indian Child Welfare Act, to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. But after reviewing all of the evidence in the light most favorable to the State, we are convinced that the district court

3

could have found it highly probable that the State used active efforts to prevent the breakup of the Indian family.

Last, the parents argue that the termination is invalid because the district court didn't have any qualified expert testimony at the adjudication stage of this case, the step at which the court determined that the children were in need of care and placed into temporary State custody. But the adjudication and the termination are separate proceedings, and an error in the former doesn't necessarily impact the validity of the latter. In this case, where those proceedings were overseen by different judges and where the termination hearing included the previously lacking qualified expert testimony, the error in the adjudication hearing was harmless.

We affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

R.B. is the natural mother of L.M.B., A.B., and L.B.; D.B. is the adoptive father of L.M.B. and the natural father of A.B. and L.B. At the time of trial, all three children were minors, but L.M.B. turned 18 in May of this year, soon after we heard oral argument in this appeal.

The children are all members of the Citizen Potawatomi Nation. The tribe was notified about and participated in this case almost from the start: the initial petition was filed on November 12, 2014, the tribe was notified on November 18, and the tribe filed its first appearance on December 18. Because the parents challenge the sufficiency of the evidence supporting the termination of their parental rights, we describe the history of this case in detail.

4

According to a police report, one night in November 2014, a visiting family member saw the parents injecting drugs in their basement while the children were upstairs. This family member also alleged that while he was high, Father had sexually assaulted her. Because of these events, the family member took the children to their maternal grandmother's home, about 1 block away, and the grandmother called the police. After the police executed a search warrant and found drug paraphernalia associated with injecting and smoking methamphetamine, the State charged both parents with possession of drug paraphernalia; Father was also charged with sexual battery.

As a result of this incident, the children were removed from their parents' home; L.M.B. went to her maternal aunt's home, and A.B. and L.B. went to their grandmother's home. According to the grandmother, the aunt, and social workers who worked on this case (all were witnesses at the termination hearing), L.M.B. was the primary caretaker for her younger siblings and had been since she was 9 years old. She did laundry, made sure they took baths, woke them up for school and made sure they were at school on time, and made them dinner. The aunt testified that she took L.M.B. while the younger siblings stayed with the grandmother in part to give L.M.B. a break from these caretaking responsibilities.

According to the grandmother, the children's living situation had been slowly deteriorating for some time; the children had been coming over to her house more frequently to borrow things their parents weren't providing, like food, toilet paper, and soap. The aunt testified that when L.M.B. first came to live with her, most of her clothing was several sizes too small; the same was true for L.B. and A.B. The grandmother said that Father would get angry if the house wasn't clean, but it was entirely the children's responsibility to keep the house clean; the parents didn't help. The grandmother testified that sometimes Father would get upset and paranoid and remove all the batteries from electronic items and unplug everything in the house, including alarm clocks, making it impossible for L.M.B. to get her siblings and herself to school on time. L.M.B. told a

social worker that her father would sometimes get angry and take nearly everything out of the house, including the children's belongings, and take them to the dump; her grandmother confirmed this story.

L.M.B. also told a social worker and family members that her father had once slammed her into a wall and her mother had once slapped her. Additionally, L.M.B. said that on at least one occasion her parents simply left for several days without telling the children that they were leaving, where they were going, or how long they'd be gone. L.B. and A.B. told their grandmother that their father never helped them with homework; he just yelled at them to do it. The grandmother stated that the children didn't have many friends because they weren't allowed to have them over at their parents' house.

L.M.B. reported that while living with her parents, she had been depressed and had self-harming thoughts. Her grandmother said that L.M.B. had been cutting herself, and her aunt reported that L.M.B. was very depressed when she first came to live with her. L.M.B. also reported to a social worker that she felt her father was nicer to L.B. and A.B. because they were his biological children, and she wasn't. And later, in February 2015 when her parents didn't show up for a temporary-custody hearing, L.M.B. was distraught and entertained suicidal thoughts because she felt like her parents didn't care about her or her siblings. L.M.B. spent a week in a psychiatric facility and then began going to therapy regularly (she continued going for about a year).

The district court had ordered that the parents, if they had clean drug tests, could visit their children; Saint Francis Community Services would supervise those visits and create and monitor a family case plan. Initially, the goal had been to reunite the family.

In December 2014, the parents visited their children once. According to a December 2014 St. Francis report, the agency had tried to call the parents on December 11, but both phone numbers had been disconnected. The agency eventually contacted the

6

parents on December 15 and scheduled a visit for the next day. St. Francis reported that the visit went well; the parents brought Christmas gifts and the family played a game together. But on December 30, when the next visit was scheduled to take place, the parents called the agency and reported that they were having financial problems, and the agency canceled the visit because the parents hadn't taken the required drug test. The parents also canceled the next two visits, which had been scheduled for early January 2015.

Next, the parents failed to appear at the temporary-custody hearing on February 20, 2015. According to the parents' testimony at the termination hearing, during this time Mother and Father were moving a lot because Father had lost his job in the oil industry. They said that they were relying on friends for support. Mother also said that they were using drugs "a lot" during this time, whenever they had money for it. Father characterized his drug use during this time as "minor" and "experimental." At some point during late February or early March, they told St. Francis that they were having extreme financial difficulties and were living in their car. At some point they also lost the car.

On March 10, the parents attempted to obtain services and help from the Potawatomi tribe in Oklahoma, and the caseworker who met with the parents described the meeting in a letter to the Kiowa County attorney. The caseworker told the parents that they would have to pass a drug test before the tribe could help them. Father had described "a conspiracy against them in Kansas" and became so angry that the caseworker was uncomfortable and asked the parents to sit in the waiting room. Father testified that he didn't know why the caseworker had gotten upset, saying that he supposed he had intimidated her because he was standing up. The parents refused to take drug tests and left.

Also on March 10, St. Francis held a meeting to develop and expand upon the family's case plan; the parents had left a phone number with St. Francis so that they could

participate in the meeting, but when the agency called, that number had been disconnected. The case plan required the parents to maintain contact with St. Francis and complete drug-and-alcohol evaluations, mental-health evaluations, and parenting classes. The plan also required the parents to obtain and maintain stable housing, comply with orders in their criminal cases, and get jobs.

Three days later, on March 13, the parents approached L.B., in violation of the court's protective order, while he was at a coffee shop in Haviland with his cousin. The cousin told police that when she told Father that he couldn't talk to L.B., Father became angry. Father grabbed L.B., hugged him, and said he was going to get L.B. back. As the cousin was trying to keep L.B. away from Father, Father was swearing loudly, and he threw her phone on the ground, breaking it. As the cousin and L.B. were getting in the car to get away from Father, Mother approached, gave L.B. a hug, and told him that they would try to get him back. The owner of the coffee shop confirmed the details of this interaction.

As a result of this event, the State charged Father with criminal intimidation of a witness, violating a protective order, criminal damage to property, and assault. On March 30, Father appeared in court for the earlier possession and sexual-battery charges. Because he refused to take a drug test, the court revoked his bond, and he was in jail from March 30 until May 5. On March 31, in jail, Father tested positive for methamphetamine. On April 22, Father pled no contest to possession of drug paraphernalia in exchange for the State dismissing the sexual-battery charge; he was sentenced to 1 year of probation. Then, on May 5, Father pled no contest to criminal intimidation and guilty to criminal damage, was found guilty of both offenses, and was placed on probation for 1 year.

The State also charged Mother with violating a protective order based on the coffee-shop incident involving L.B. On April 15, Mother went to jail after she violated the protective order again by driving to L.M.B.'s school and shouting at her in the school

parking lot. On May 5, Mother pled guilty to one count of violating a protective order in exchange for the State dismissing her earlier charge for possession of drug paraphernalia. She was placed on probation for 1 year.

The district court held a status hearing on May 18; this time, the parents attended. St. Francis noted that there had been no parental visits since that first visit in December 2014, in part because Father had been in jail from March 30 to May 5 and Mother had been in jail from April 15 to May 5. St. Francis said that as of May 8, both parents were out of jail but hadn't been in touch with the agency. The aunt had reported to St. Francis that she believed the parents were currently homeless and that their car had been repossessed. St. Francis also reported on L.M.B.'s hospitalization following her suicidal thoughts and her continuing therapy, noting that her aunt said her mood had improved. The children were all doing well in school and were beginning to get involved in extracurricular activities such as art and baseball. The district court ordered the parents to get drug and alcohol evaluations, comply with any orders entered in their criminal cases, and work the case plan. It also ordered a court-appointed special advocate, or CASA volunteer, for the children.

Mother tested positive for methamphetamine on June 12. Father wasn't tested on that date because he said he was working and couldn't get away. Both parents had clean drug tests on June 25.

A month later, St. Francis reported that the parents were living at a motel in Dodge City, looking for a home to rent and a car to buy. The parents had told St. Francis that they had completed mental-health intakes but didn't provide documentation. Mother said she had been working but wasn't currently. Father said he had been working for a concrete company and was now working for a trucking company, but he provided no proof. St. Francis noted that contacting the parents was difficult at times because

9

Mother's phone was often out of minutes, making it difficult to schedule drug tests and visitation.

The children told St. Francis that they would like visitation with their mother but not with their father. St. Francis also noted that L.M.B. had obtained her driver's permit, L.B. was playing baseball and learning to cook, and A.B. was learning to sew. The CASA volunteer reported the same information regarding the parents' current work and living situation. The CASA volunteer said that the children were doing well in their placements and that she did not have a working phone number for the parents.

On July 20, the district court held another hearing, and the parents did not appear. At this hearing, the district court changed the case goal from reintegration to termination of parental rights because the parents had failed to work the case plan, had failed to follow the terms of their probation, and had failed drug tests.

The parents were both arrested in late July for violating their probation by failing to report and make court payments, among other things. Mother served 30 days in jail and then was placed back on probation; Father served 6 months in jail and wasn't released until the end of January 2016.

The State filed a motion to terminate parental rights on August 21, 2015. Mother testified at the termination hearing that when she learned about the termination motion, she realized the error of her ways (at the time, she was in jail for violating the protective order). Father, who was also in jail, got so angry when he learned of the termination motion that he cut up a t-shirt. (He later pled guilty to criminal damage for this.)

The termination hearing was initially set for October 19, but when the State realized that it needed a qualified expert witness under the Indian Child Welfare Act, the hearing was rescheduled.

10

The district court held a status hearing on November 9, and both parents appeared. Mother had tested positive for benzodiazepine, though she claimed she had a prescription for it. St. Francis reported that Mother was living with a friend in Pratt and had left Father, who was still in jail. (The parents' separation would not last.) Mother had completed a drug-and-alcohol evaluation on October 15, and the evaluation recommended that she attend drug-and-alcohol-education programs and attend recovery meetings. She was attending a recovery program called Celebrate Recovery and working at Best Western, though she hadn't yet provided St. Francis proof of either employment or drug treatment. St. Francis noted that it was still difficult to contact Mother at times. St. Francis also noted that L.M.B. was participating in a scholars' bowl at school, L.B. liked cooking breakfast, and A.B. was playing volleyball and in the drama club.

In March 2016, St. Francis noted that there still hadn't been any parental visits, in part because L.B. and A.B. had begun exhibiting some negative behaviors: L.B. had been wetting the bed and making weapons to protect himself from Father, and A.B. was having bouts of anger. Both had begun attending therapy twice a month. St. Francis also noted that L.B. was playing basketball and A.B. was joining track. Mother wrote each child a letter; none wrote back.

The parents reported that they were living with a friend in Pratt. Mother had been fired from Best Western but had gotten a job at Larned State Hospital. She said she had been attending Celebrate Recovery regularly and therapy once a month. She had completed a parenting class in December 2015. Father had been released from jail at the end of January and was working for a trucking company; he provided a pay stub. Father said he had plans to get a mental-health intake and a drug-and-alcohol assessment and would soon begin parenting classes.

The termination hearing took place on May 2, 2016. Various social workers, the grandmother, and the aunt all testified as previously described about the children's living situation with their parents and the harm it had caused. They each stated that the children shouldn't be returned to their parents' home.

The CASA volunteer testified and filed a report for the termination hearing. She had visited with the children about 10 times, and she reported that the children were doing well in their placements and were more confident, less anxious, and happier; their grades had improved; and they were all involved in extracurricular activities. The CASA volunteer concluded that Father "does not seem to understand the trauma the children have gone through," noting that he had said that the children had exaggerated what their home was like. She testified that both parents felt that they hadn't been treated fairly in this process. She recommended terminating parental rights because although both parents had shown recent signs of working the case plan, they hadn't taken any steps for the first year that their children were out of their home, and because the children had repeatedly stated that they didn't want to have contact with their parents. She testified that even though the parents had made some recent progress, it was basically too late to make a difference.

The district court also heard testimony from Dr. Eric Anderson. The parents argued that he wasn't a qualified expert witness under the Indian Child Welfare Act, but the district court overruled their objections. Dr. Anderson is a member of the same tribe as the children (the Citizen Potawatomi Nation), has a PhD in Native American history, and is chair and professor of indigenous American Indian studies at Haskell Indian Nations University. He has studied the Indian Child Welfare Act and teaches about that Act in his university classes. He testified that he did not have experience in the direct delivery of child and family services to Indian children and hadn't testified in a termination case before.

12

Dr. Anderson said that the tribe had been fully involved in this case and that the tribe's choice not to exercise jurisdiction suggested that the tribe approved of the proceedings. He also approved of the children's current placements because the tribe's cultural practices privilege the maternal family line, and the children had been placed with close maternal family members. He said that it would be the tribe's viewpoint that having maternal relatives raise the children was essentially the same as having the parents raise the children. Dr. Anderson said that the parents' conduct was likely to result in serious physical or emotional harm to the children, that the parents' late attempts to comply with the case plan were too little, too late, and that it didn't appear the parents could be persuaded to change their conduct.

None of the children testified, but the district court did consider a letter from L.M.B. She asked the court to terminate her parents' rights. The letter confirmed that L.M.B. had been the parent to her younger siblings and that her parents had failed to provide necessary items like clean clothing. It also detailed her depression and her parents' emotional abuse.

Both parents testified at the termination hearing and focused on the steps they had taken toward completing tasks in the case plan.

Mother had completed a mental-health assessment in April 2015, drug and alcohol evaluations in October and November 2015, and a parenting class in December 2015. On cross-examination, it became clear that the April 2015 assessment wasn't of much use because it included obviously untrue responses about drug use.

Father said he had completed a mental-health evaluation and a drug-and-alcohol assessment in March 2016 and a parenting class in April 2016. But the drug-and-alcohol assessment was based on dishonest information Father provided, and the mental-health

evaluation was actually just a letter stating that Father did the evaluation—it didn't include the results of the evaluation.

The parents also submitted a lease agreement and a utility bill showing that they were renting a two-bedroom house as of April 1, 2016. Mother testified that she currently worked at Larned State Hospital, and she submitted pay stubs from that job going back to January 2016. Father submitted pay stubs showing that he began working at D & R Trucking in February 2016 and testified that he was still working there. But Father also said that he hadn't made any child support payments despite having gotten a stable job.

Regarding drug use, Mother said she had been clean for 9 or 10 months, and she had begun regularly attending Celebrate Recovery when she got out of jail at the end of August 2015. Father testified that he had also been attending Celebrate Recovery since his release from jail at the end of January 2016. But both parents made a variety of inconsistent statements about their drug use.

Father characterized his methamphetamine use as "minor" and "experimental," saying he had used about once a month. When asked if he used methamphetamine "regularly," he said that he didn't know what qualified as "regular." But Mother had testified that she and Father had both used methamphetamine several times a month, whenever they had money for it. Father also admitted to having refused at least three drug tests while this case was ongoing. And he admitted that he had falsely claimed in his April 2016 drug-and-alcohol evaluation that he hadn't used drugs since June 2014, that he had misreported his alcohol use, and that he should have answered "yes" to the question about drug use having negatively impacted his relationships. Father also claimed that he had never injected methamphetamine with needles, despite his conviction for possession of drug paraphernalia based in part on needles found in his basement in November 2014. Ultimately, Father agreed that it would be a fair statement to say that he had a history of drug and alcohol abuse, based on drug-related convictions in 1998, 1994, and 1992.

14

Mother insisted that she had only used methamphetamine once or twice before her children were removed in November 2014. She said that she hadn't been using a needle to inject methamphetamine the night before her children were taken away. She did admit that after her children had been taken away, she had used drugs more often, "[s]poradically, if we had money." Although Mother testified that she took a first step toward following the case plan in April 2015 by completing a mental-health intake, she didn't report any substance-abuse problems in this intake, causing the clinician to note: "Very difficult to determine how honest [Mother] was in describing her conditions, considering she is being charged with a drug related offense." One of her assessments noted that she reported using methamphetamine as a way to feel closer to her husband. Mother also testified that she was currently taking, by prescription, Lexapro for depression, lorazepam for anxiety, hydrocodone for pain, and Ambien for help sleeping. She said she had taken pain medication in the past, as well, and her mother (the children's grandmother) testified that Mother had had problems with abusing pain medication in the past.

Because the hearing took longer than expected (finishing after 6 o'clock in the evening), the court heard closing argument from the parties about 3 weeks later, on May 23, 2016. After hearing argument, the court announced its factual findings and, based on those findings, terminated Mother's and Father's parental rights.

Both parents have appealed to our court.

ANALYSIS

I. *The District Court Correctly Determined, Beyond a Reasonable Doubt and Supported by Qualified Expert Testimony, That if L.M.B., A.B., and L.B. Remained in Their Parents' Custody, Serious Emotional or Physical Damage Would Be Likely to Result.*

Mother argues that the evidence wasn't sufficient for the district court to conclude beyond a reasonable doubt that the children would be likely to suffer serious physical or emotional damage if they remained in their parents' custody. Both parents argue that the State's expert witness wasn't qualified under the Indian Child Welfare Act.

Generally, a Kansas court can terminate parental rights if it "finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). But when the child is an Indian child, the higher standards in the federal Indian Child Welfare Act also apply, requiring proof beyond a reasonable doubt and supported by qualified expert testimony that continued parental custody would likely result in serious emotional or physical damage to the child. 25 U.S.C.A. § 1912(f) (2012); *In re A.P.*, 25 Kan. App. 2d 268, 277, 961 P.2d 706 (1998). Compare *In re B.D.Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (requiring clear-and-convincing evidence in cases not involving an Indian child). We have generally applied both the state and federal standards in termination cases involving an Indian child. *In re A.P.*, 25 Kan. App. 2d at 277-78; *In re S.M.P., Jr.*, No. 108,209, 2012 WL 6734666, at *3 (Kan. App. 2012) (unpublished opinion). In this appeal, though, the parents challenge the sufficiency of the evidence only under the federal standard, so we will focus on it.

Since this appeal comes after the factfinder (here, the trial court) has ruled in favor of the State, we must take the evidence in the light most favorable to the State. So the

question we ask is whether, when viewing the evidence in that light, we are convinced that a rational factfinder could have found, beyond a reasonable doubt, that continued parental custody would have been likely to result in serious emotional or physical harm to the children. *A.P.*, 25 Kan. App. 2d at 279; *In re S.M.P., Jr.*, 2012 WL 6734666, at *3; see *B.D.-Y.*, 286 Kan. at 705. When applying this standard, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. See *B.D.-Y.*, 286 Kan. at 705.

Mother generally challenges the sufficiency of the evidence and claims that the district court didn't sufficiently consider the parents' recent efforts to improve their lives and comply with their case plan. But the district court heard from Mother and Father about their recent efforts: they had recently signed a lease, both were employed, both were attending Celebrate Recovery, both had completed parenting classes, and both had obtained the recommended drug and mental-health assessments. However, they didn't complete their case plans until April 2016, a year and a half after their children were initially removed from their home. Mother arguably did her first task a year earlier, when she obtained a drug-and-alcohol assessment in April 2015, but that assessment was shown at trial not to have been useful, having been based on false information supplied by Mother. She didn't fully commit to following through on the case plan until the end of August 2015, after spending a month in jail and after the State had filed its motion for termination of parental rights.

Father didn't begin following the case plan until the end of January 2016, when he was released from prison. And Father arguably hadn't yet completed his initial case-plan tasks; while he provided a letter showing that he obtained a mental-health assessment, he didn't provide the assessment itself.

The district court noted that both Mother and Father continued to blame St. Francis and other people for their problems instead of taking full responsibility. The

district court also specifically noted that Mother and Father had problems with honesty, while it found almost every other witness credible. So, weighing the parents' late remedial efforts against their year-long delay and dishonesty, plus the evidence of neglect and abuse before the children were removed, evidence of the children's mental health, and the parents' history of drug abuse, the district court terminated parental rights. Even if we thought that the balance should have come out differently, we are not in a position to reweigh the evidence or second-guess the court's credibility conclusions. Simply put, considering all of the facts in the light most favorable to the State, the district court could reasonably conclude that if the children continued in their parents' custody, serious emotional or physical harm would be likely to result. See *A.P.*, 25 Kan. App. 2d at 279.

In addition to imposing the beyond-a-reasonable-doubt standard, the Indian Child Welfare Act also requires the testimony of a qualified expert witness to support the conclusion that continued parental custody would be likely to result in serious emotional or physical harm to the children. 25 U.S.C.A. § 1912(f). Mother and Father make different arguments about the expert testimony; we begin with Father's argument that Dr. Anderson wasn't a qualified expert witness.

We generally review the qualification of witnesses as experts for an abuse of discretion. *In re M.F.*, 290 Kan. 142, 150, 225 P.3d 1177 (2010); *In re M.K.*, No. 113,961, 2015 WL 9459829, at *6 (Kan. App. 2015) (unpublished opinion). But to properly exercise that discretion, the district court must apply the correct legal standard for who qualifies as an expert witness; we review the question of which legal standard applies independently and won't defer to the district court's conclusion. *M.F.*, 290 Kan. at 150.

The Indian Child Welfare Act doesn't define "qualified expert witness," so we must turn to other sources when interpreting what that means. *M.F.*, 290 Kan. at 151. The Act's legislative history doesn't provide any guidance, but the Bureau of Indian Affairs

has published guidelines to assist state courts in applying the Act—the original guidelines were published in 1979, and an updated version was published in February 2015. 290 Kan. at 151; see 44 Fed. Reg. 67,584 (1979); 80 Fed. Reg. 10,146 (2015). Kansas and other state courts routinely rely on these guidelines in cases involving the Act. See *M.F.*, 290 Kan. at 151-52 (citing cases).

The district court didn't specify which version of the guidelines it relied on when it found that Dr. Anderson was a qualified expert witness. While the changes from the 1979 to the 2015 version are arguably minor, we note that the district court should have been following the 2015 guidelines, which state, "Effective [February 25, 2015], these guidelines supersede and replace the guidelines published in 1979." 80 Fed. Reg. 10,146, 10,147 (2015). Since the termination hearing took place in May 2016, the new guidelines had taken effect.

Section D.4 of the guidelines cover who may serve as a qualified expert witness. The first sentence of that section provides the general rule: "A qualified expert witness should have specific knowledge of the Indian tribe's culture and customs." 80 Fed. Reg. 10,146, 10,157 (2015). The guidelines then offer four types of people who, based primarily on their knowledge of Indian tribal customs, are "presumed to meet the requirements for a qualified expert witness":

"(1) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(2) A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.

"(3) A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and

19

knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

"(4) A professional person having substantial education and experience in the area of his or her specialty who can demonstrate knowledge of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe." 80 Fed. Reg. 10,146, 10,157 (2015).

The guidelines say that these four criteria under which a person is "presumed" to be a qualified expert are listed "in descending order." That's a bit confusing since meeting any of the criteria makes a person presumptively qualified—and a person could apparently qualify even if none of the presumptions applied but the court found on some other basis that the person had sufficient knowledge of the tribe's culture and customs. After all, these four subparagraphs are just situations in which qualification is presumed. Comments to the guidelines indicate that the order of preference was intended to "ensure that the expert witness with the most knowledge of the Indian child's tribe is given priority." 80 Fed. Reg. 10,146, 10,149 (2015).

We need not dwell on the effect of the ordering of the subparagraphs because Dr. Anderson falls into the first—and most preferred—category: a member of the Indian child's tribe who is "recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices." See 80 Fed. Reg. 10,146, 10,157 (2015); see also 44 Fed. Reg. at 67,593 (identical provision). He is a member of the Citizen Potawatomi Nation. Along with growing up in this tribe, he has a PhD in Native American history, is chair and professor of indigenous American Indian studies at Haskell Indian Nations University, and has studied and taught classes on the Indian Child Welfare Act.

Father argues that Dr. Anderson isn't qualified because he has no experience with child-in-need-of-care proceedings or with the direct delivery of child and family services. This lack of experience would be a problem if Dr. Anderson were trying to qualify as an

expert witness under subsections (2) or (3), both of which require knowledge of or experience in the delivery of child and family services to Indian families. But Dr. Anderson doesn't need to qualify under subsections (2) or (3)—he is already presumed to be a qualified expert witness under subsection (1), so his lack of knowledge about the delivery of child and family services isn't disqualifying.

Father claims that the guidelines require an expert to have basic social-work experience, but that simply isn't the case: subsection (1) says nothing about social-work experience. It is true that having social-work experience isn't *sufficient* to qualify as an expert under the Indian Child Welfare Act—some other expertise related to Indian culture is needed—but that doesn't mean that being a social worker is *necessary*. *M.F.*, 290 Kan. 155; see 80 Fed. Reg. 10,146, 10,157 (2015) (discussing expert subsections [3] and [4]). The guidelines focus on the witness' specific knowledge of the Indian tribe's culture and customs, and as Father concedes in his brief on appeal, "Dr. Anderson has extensive knowledge of the customs and heritage of the Citizen Band Pottawatomie tribe." Dr. Anderson was presumed under the guidelines to be a qualified expert witness under the Indian Child Welfare Act. While it's theoretically possible that a party could show at trial that a witness who met one of the presumption criteria nevertheless wasn't a qualified expert witness, Father has not shown any abuse of discretion in the district court's decision to accept the presumption in this case.

Mother makes a different argument: she claims that Dr. Anderson wasn't qualified as an expert witness because he didn't know anything about the parents' current living conditions. Expert testimony in an Indian-child case must support the district court's conclusion that continued parental custody is likely to result in serious emotional or physical harm to the children. *A.P.*, 25 Kan. App. 2d at 278. And the Bureau of Indian Affairs guidelines provide that there must be "a causal relationship between the existence of particular conditions in the home that are likely to result in serious emotional or physical damage" to the children. 80 Fed. Reg. 10,146, 10,156 (2015). And "the existence

21

of particular conditions in the home" does include the parents' current living conditions, not just past conditions. His testimony came before the parents took the stand, so he didn't get to hear Mother's or Father's personal versions of the improvements they had made, but he did hear from other witnesses about those improvements. So Dr. Anderson knew about the parents' struggles, including drug use, homelessness, jail sentences, and failure to remain in touch with St. Francis, but he also knew that in the months leading up to the termination hearing, the parents had made some positive changes in their lives. Nonetheless, Dr. Anderson said that "within tribal custom, to a large extent, the past behaviors speak for [themselves]," and he testified that he believed the parents' conduct was likely to result in serious physical or emotional harm to the children, that the parents' late attempts to comply with the case plan were too little, too late, and that it didn't appear the parents could be persuaded to change their conduct. So Dr. Anderson's opinion *did* take into account the parents' current living situation. Furthermore, while the district court's ultimate conclusion terminating parental rights must be *supported* by expert testimony, it can also be based on other evidence, so even if Dr. Anderson's testimony didn't sufficiently account for the parents' current living situation, the district court could still consider the parents' current conditions on its own. And it did so, specifically finding that the parents' efforts were too little and too late and that neither parent was very far along in their drug-addiction recovery.

II. *The District Court's Finding That the State Used "Active Efforts" to Prevent the Breakup of the Indian Family Is Supported by Sufficient Evidence.*

The parents next challenge the district court's finding that the State complied with a provision of the Indian Child Welfare Act that requires the State to use "active efforts" to prevent the breakup of the Indian family. The Act requires that when seeking termination of parental rights, the State must prove, by clear and convincing evidence, that it used active efforts to prevent the breakup of the Indian family: "[the State] shall satisfy the court that active efforts have been made to provide remedial services and

22

rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); *A.P.*, 25 Kan. App. 2d 268, Syl. ¶ 9 (providing the clear-and-convincing-evidence burden of proof on this issue). "Clear and convincing evidence" is evidence that proves something is highly probable. *B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3. (We recognize that some states require proof beyond a reasonable doubt on the active-efforts issue, but most, like Kansas, require clear and convincing evidence. See *Yvonne L. v. Ariz. Dept. of Economic Security*, 227 Ariz. 415, 420-21, 258 P.3d 233 [Ariz. App. 2011]. Appellants in this case have not suggested that the reasonable-doubt standard applies to the active-efforts issue.)

We note that all of the parties in this case describe the standard of review as whether substantial evidence supports the active-efforts finding—but this standard, from a 1998 decision of this court, isn't good law anymore. See *A.P.*, 25 Kan. App. 2d 268, Syl. ¶ 10. In 2008, the Kansas Supreme Court modified how we review district court findings that should be based on clear and convincing evidence. *B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. So we apply that newer standard, asking whether, after reviewing of all the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found the determination—that the State used active efforts—to be highly probable. *B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4.

Kansas caselaw provides little guidance as to what constitutes active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." Once again, though, Kansas courts have looked to the Bureau of Indian Affairs guidelines for direction, and the guidelines provide a wealth of instruction on what constitutes active efforts. *M.F.*, 290 Kan. at 152; *In re S.M.H.*, 33 Kan. App. 2d 424, 433, 103 P.3d 976 (2005). First, the guidelines state that "active efforts" means something more than the "reasonable efforts" standard that may apply in non-Indian-child termination proceedings. 80 Fed. Reg. 10,146, 10,147 (2015); *State v. Yodell*, 367 P.3d 881, 885 (N.M. Ct. App. 2015). Compare K.S.A. 2016 Supp. 38-2269(b)(7) (providing

23

that the State must show failure of reasonable efforts to rehabilitate the family at termination hearing). Next, the guidelines explain that the purpose of the active-efforts requirement is to "maintain and reunite an Indian child with his or her family or tribal community." 80 Fed. Reg. 10,146, 10,150 (2015). Then, the guidelines list 15 examples of active efforts:

"(1) Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);

"(2) Taking steps necessary to keep siblings together;

"(3) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

"(4) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;

"(5) Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;

"(6) Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting the assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;

"(7) Offering and employing all available and culturally appropriate family preservation strategies;

"(8) Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

"(9) Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;

"(10) Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;

"(11) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those resources;

"(12) Monitoring progress and participation in services;

24

"(13) Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available;

"(14) Supporting regular visits and trial home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and

"(15) Providing post-reunification services and monitoring." 80 Fed. Reg. 10,146, 10,150 (2015).

Of these 15 examples, only the last one isn't relevant to this case, since there was no reunification. The remaining 14 can be loosely grouped in two categories: (1) active efforts to involve the children's tribe and extended family members to assure that the children's Indian culture is protected and respected and (2) active efforts to keep the family together and help the parents obtain necessary resources.

First, it appears that the State made every effort to involve the children's tribe and extended family members and protect the children's Indian culture; indeed, neither parent takes issue with this part of the State's active efforts (in fact, they largely ignore it). The State involved the children's tribe; the tribe participated in the creation of the case plan and was fully involved throughout the case. Dr. Anderson testified that the tribe's decision not to exercise jurisdiction over this case suggested that it approved of the State's actions. The State didn't need to search for extended family members; the grandmother and aunt were involved from the start and remained involved throughout the case. In fact, the State made specific decisions to ensure that the children could remain with their family members rather than being placed in other foster homes. St. Francis met regularly with the children and their grandmother and aunt to review the case plan and discuss how the children were doing. The State respected the children's Indian cultural traditions by placing them with maternal relatives—according to Dr. Anderson's expert testimony, the cultural tradition of the Citizen Potawatomie Nation is matrilineal and views maternal relatives and parents as co-equal for raising children. The State kept the two younger children together and placed them with their grandmother. It did place

25

L.M.B. separately, with her aunt, but it did so intentionally, to give L.M.B. a break from the parental duties she had assumed while the children were still living with their parents. St. Francis also attempted to facilitate parental visits, conditioned on clean drug tests for the parents, but the parents only showed up for one such visit. The agency also assisted the children by getting therapy for the children when needed.

The parents' arguments center around the second category of "active efforts": They claim that the State merely created the case plan and then didn't help the parents complete it. Mother and Father argue from this that the State didn't use active efforts. St. Francis first created a case plan designed to reintegrate the family in December 2014 and elaborated on that plan in March 2015.

With that claim in mind, let's review the State's efforts (through its contractor, St. Francis) related to the case plan. The plan required the parents to complete a parenting class and obtain a drug-and-alcohol assessment, among other things. St. Francis provided the parents with referrals where they could complete these case-plan tasks. Later, when the parents moved to a different town in Kansas, St. Francis provided information about similar services available there.

The precise details of the help that St. Francis provided to the parents are hazy, in part, it seems, because St. Francis found it so difficult to even contact the parents, let alone provide them with additional help. The parents canceled three of four scheduled visits with their children in December 2014 and January 2015. The parents didn't appear at the adjudication hearing in February 2015 or at the case-plan meeting in March 2015. Also in March, the parents tried to obtain services from the tribe itself but left when the tribe said they would have to pass a drug test. As of May 2015, the parents were homeless and had lost their car. According to Mother's testimony, during this time both parents were using methamphetamine whenever they had any money. As late as mid-June, about 7 months after the children were first removed, Mother tested positive for

methamphetamine. After the parents had a negative drug test at the end of June 2015, St. Francis tried to contact the parents but couldn't reach them. Another failed contact took place on July 10, 2015; the parents had provided nonworking phone numbers. Then, both parents went to jail at the end of July, Mother for 1 month and Father for 6. Overall, the parents had three supervised visits with the children, in December 2014, May 2015, and July 2015.

The parents make much of the testimony from a St. Francis caseworker that she hadn't treated this case any differently from her other, non-Indian-child cases, claiming that her statement proves the State provided only the normal, "reasonable efforts," and not the heightened, "active efforts" required by the Indian Child Welfare Act. We are not persuaded. Despite the caseworker's testimony, St. Francis did many things that it doesn't do in the ordinary case, given the involvement of the Citizen Potawatomi Tribe. Moreover, while it's probably true that St. Francis could have done more to help the parents and that such actions would count as "active efforts," it's simply not the case that "active efforts" means "absolutely every effort." See *Yvonne L.*, 227 Ariz. at 423; *Jimmie G. v. Dept. of Child Safety*, 2017 WL 2374681, at *2 (Ariz. App. 2017) (unpublished opinion). And the parents' narrow focus on the ways that St. Francis failed to help *them* (despite their routine unavailability) ignores the other ways that St. Francis was engaged in active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family," including involving the tribe and keeping the children with maternal family members in line with the cultural traditions of the tribe. See 25 U.S.C. § 1912(d). Finally, we return, as we must, to our standard of review. We must look at the evidence in the light most favorable to the State. From that vantage point, the district court could have found that it was highly probable that the State used active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.

III. *The District Court Did Not Err by Refusing to Dismiss the Case Because the Adjudication Hearing Didn't Include Testimony from a Qualified Expert.*

The parents also argue that the district court violated the Indian Child Welfare Act when it adjudicated the children as children in need of care and placed them outside parental custody without qualified expert testimony. Proceedings that end in termination of parental rights in Kansas have two major phases. First, there's an adjudication, after stipulations or an evidentiary hearing, that the child is in need of care. Second, if termination of parental rights is ultimately sought, there's a termination order, also after stipulations or an evidentiary hearing. Because no expert testimony was presented in this case at the adjudication hearing, Mother and Father claim that the district court should have dismissed the action at that time.

The Indian Child Welfare Act requires qualified expert testimony both in child-custody proceedings (here, the adjudication phase at which the children may be temporarily placed in State custody) and for the termination of parental rights. 25 U.S.C. § 1912(e), (f). The parties agree that the district court violated 25 U.S.C. section 1912(e) in February 2015 when it determined—without qualified expert testimony—that L.M.B., A.B., and L.B. were children in need of care and ordered that they remain out of their parents' custody. But the State argues (and the district court found) that this error was harmless because the district court did hear qualified expert testimony at the termination hearing, thereby complying with 25 U.S.C. section 1912(f).

An error is harmless if it doesn't affect a party's substantial rights. K.S.A. 2016 Supp. 60-261 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *State v. Ward*, 292 Kan. 541, 562, 256 P.3d 801 (2011). Generally, when applying the harmless-error rule, we must find that there is no reasonable probability that the error affected the outcome. 292 Kan. at 565. But if the error implicates a constitutional right, we must find beyond a reasonable

doubt that the error didn't affect the outcome. 292 Kan. at 565. Here, the error is the failure to comply with a statutory requirement, not a constitutional one.

But the parents argue that violations of the Indian Child Welfare Act can never be harmless. And in one case—in which there was no expert testimony either, at the adjudication stage or at termination—the Kansas Supreme Court seemed to suggest that failure to follow the Indian Child Welfare Act couldn't be found to be harmless error. The statement came in the *M.F.* case, in which the case reached our Supreme Court on appeal from a termination of parental rights that had been ordered without any supporting expert testimony. The court first observed that the Act, under section 1914, allows a parent to file a petition to invalidate a custody or termination decision if certain of the Act's procedural requirements (including the expert-witness requirement) weren't followed. See 25 U.S.C. § 1914 (2012). Section 1914 certainly emphasizes that importance of the Act's procedural requirements. So the *M.F.* court stated in passing that "it is difficult to conclude a procedural violation of [the Indian Child Welfare Act] can be harmless." *M.F.*, 290 Kan. at 157 (citing 25 U.S.C. § 1914).

Our court has been unsure how to interpret this statement. What is clear is that the procedural requirements of the Indian Child Welfare Act are important and shouldn't be lightly discarded. See *M.F.*, 290 Kan. at 157. Ultimately, we cannot ignore the context in which the *M.F.* court made its statement: there, the district court didn't have expert testimony at *either* the adjudication *or* the termination stage—a substantially more egregious error than the one in this case. And we also note that the *M.F.* court's actual holding wasn't the broad statement that harmless error doesn't apply to Indian-child cases; it was that the error in that particular case required reversal. 290 Kan. at 157.

Our court has applied a harmless-error analysis in published opinions involving the Indian Child Welfare Act (albeit in cases that predate *M.F.*). See, *e.g.*, *In re M.B.*, 39 Kan. App. 2d 31, 40-41, 476 P.3d 977 (2008) ("[E]ven if the provisions of the ICWA are

not initially followed, subsequent remedial action by the district court may bring a termination of parental rights case into compliance with the requirements of the Act."); *In re S.M.H.*, 33 Kan. App. 2d 424, 441, 103 P.3d 976, *rev. denied* 279 Kan. 1006 (2005); *In re H.A.M.*, 25 Kan. App. 2d 289, Syl. ¶ 2, 961 P.2d 716 (1998) (failure to comply with notice provision harmless because tribe ended up participating in the case); see also *In re J.J.G.*, 32 Kan. App. 2d 448, 453, 83 P.3d 1264 (2004) (finding that literal compliance with the Act wasn't necessary because the tribe didn't challenge the termination and the termination nonetheless kept the child integrated with native heritage). After *M.F.*, we've had conflicting statements in two unpublished opinions. Compare *In re A.M.*, No. 108,012, 2013 WL 518019, at *4 (Kan. App.) (unpublished opinion) (describing *M.F.* as "noting that the harmless error rule is applicable to errors in compliance with the Indian Child Welfare Act in termination of parental rights cases"), *rev. denied* 297 Kan. 1245 (2013), with *In re A.O.*, No. 108,126, 2012 WL 6217351, at *1 (Kan. App. 2012) (unpublished opinion) (describing *M.F.* as "holding that a procedural violation of the ICWA cannot be harmless in light of the clear language of 25 U.S.C. § 1914 [2006]").

Ultimately, we conclude that the harmless-error rule does apply.

First, other states have applied the rule. See *In re Enrique P.*, 14 Neb. App. 453, 709 N.W.2d 676 (2006) (failure to provide qualified expert witness was harmless when psychological evaluation and case-workers' court reports clearly and convincingly showed that parental custody would result in serious damage to child); *In re Tamika R.*, 973 A.2d 547, 553 (R. I. 2009). And the burden of proof that was required at termination (beyond a reasonable doubt) was higher than what was needed at adjudication (clear and convincing evidence), further convincing us that the qualified expert testimony at the termination hearing effectively cured any possible harm that resulted from not having such testimony at the adjudication stage.

We affirm the district court's judgment.